**In the Matter of Derek W. BURNS, A Minor Child.**

Supreme Court of Delaware.

Submitted: June 10, 1986.
Decided: Dec. 19, 1986.

Carolyn R. Schlecker (argued) and Merril L. Zebe (argued), of Community Legal Aid Society, Inc., Wilmington, for appellant.

Beth E. Evans (argued), of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellee The Children's Bureau, Inc.

Janice R. Tigani, Dept. of Justice, Wilmington, for appellee Div. of Child Protective Services.

Before HORSEY, MOORE and WALSH, JJ.

MOORE, Justice.

In this termination of parental rights case we consider for the first time the State's obligations to promote family stability and preserve the family unit, whenever feasible, under the federal Adoption Assistance and Child Welfare Act of 1980 (the "Child Welfare Act" or the "Act")[1] and concomitant Delaware law, 29 *Del.C.* §§ 9001, 9003(3)(a–b), (4).

The Family Court terminated the parental rights of Judy Burns and David Black in their illegitimate minor son, Derek. For ease of reference, and to protect the identities of the parties, we have used pseudonyms. The Delaware Division of Child Protective Services ("DCPS" or "the Division"), a state agency, and the Children's Bureau of Delaware, Inc. ("the Children's Bureau") sought to terminate these parental rights, alleging that both parents were unable, and had failed, to plan adequately for Derek's physical needs under 13 *Del.C.* § 1103(5).[2] The father's rights were termi-

1. P.L. 96–272, 42 U.S.C. §§ 608, 620–28 and 670–76 (1982). *See* M.L. Allen, C. Golubock and L. Olson, *A Guide to the Adoption Assistance and Child Welfare Act of 1980,* reprinted in M. Har-den, *Foster Children in the Courts* 575–611 (1983).

2. 13 *Del.C.* § 1103(5) provides, in pertinent part:

nated because he abandoned and failed to plan adequately for Derek.[3] No appeal has been taken from that decision. Relief was granted against the mother for her alleged failure to plan adequately for the child.

The mother appeals the trial court's ruling on several grounds, only two of which are pertinent to our decision: (1) that the mother, then a minor, was forced to relinquish custody of Derek without any independent advice, and denied her basic due process rights at every important stage of the termination proceedings; and (2) that the Family Court failed to apply the provisions of the Child Welfare Act to this case. There is merit to both of these contentions, and they find ample support in the record. Accordingly, we reverse and return custody to the mother.

## I.

Judy Burns, the mother, was born on April 9, 1966. When she was one month old, she and her siblings were taken from their natural parents and placed in foster homes by the Division. She remained with one foster family for ten years until the Division deemed the situation unsatisfactory. From that time until she was approximately seventeen, Judy lived in at least thirteen other places, either in shelters, foster homes or with relatives.

On August 21, 1983, while still an unwed minor in the custody of the Division, Judy gave birth to Derek. She was seventeen years old and was then living with her natural mother in Chicago. Judy's living arrangements with the child's father and with her family were unsatisfactory and she returned to Delaware, with Derek, in October 1983. Thereafter, she lived for some time with her natural father, and then with her natural brother and a previous foster sister. As often happens in such unfortunate circumstances, Judy's relationships with these people deteriorated, leaving her destitute and homeless.

As a minor still in the technical custody of the Division, she turned to it for help. On January 4, 1984, at the age of seventeen, and without the guidance or counsel of any independent person who could advise her of the extent and purport of her action, Judy was required by DCPS, as a condition of its assistance, to sign a document called a Voluntary Placement Agreement. This three-page instrument, filled with legal terms and the esoteric language of social workers, was of broad effect. It provided for the "placement" of both Judy and Derek solely because "we don't have a place to stay". There is no suggestion that Derek was a neglected, abused or abandoned child. Among this agreement's various provisions were the following:

> I understand that I have the right at any time to ask that my child(ren) be returned. The Agency will return my child(ren) to me within 48 hours (except weekends) of my request *unless* the Agency determines that the child(ren) would be at risk of dependency, neglect or abuse.

The procedure for termination of parental rights ... for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears that:
(5) The parent or parents of any child, or any person holding parental rights over such child, are not able, or have failed, to plan adequately for the child's physical needs or his mental and emotional health and development and:
a. In the case of the child in the care of an authorized agency:
1. The child has been in the care of an authorized agency for 1 year, or there is a history of previous placement or placements of this child, or a history of neglect, abuse or lack of care of other children by this parent; and
2. The conditions which led to the child's placement still persist, and there appears to be little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future.
\* \* \* \* \* \*

3. 13 *Del.C.* § 1103(3) states that abandonment of a child constitutes adequate grounds for the termination of parental rights.

My worker will make a home evaluation before releasing my child(ren) to me. If I refuse to cooperate in this evaluation or if the Agency believes my child(ren) are at risk of dependency, neglect or abuse when I request their return or at any time while they are in Agency care, the Agency will ask the court to issue a custody order so that my child(ren) may stay in Agency care.

If a court order is requested, I have a right to have an attorney represent me in hearings which may occur before the court can order my child(ren) into Agency care and custody.

I understand that this agreement and voluntary placement cannot last more than 90 days. It will end on 4/2/84. By this date I understand that *one* of the following two events must occur:

1) my child(ren) will be returned to me, or

2) the Agency will obtain legal custody of my child(ren) so that he/she/they can remain in placement.

(Emphasis in original)

Execution of this document was something of a Hobson's choice offered the mother by a Division social worker. Either Judy signed or Derek would be taken from her. While the social worker described the matter more euphemistically, the mother's account was not disputed in any essential detail:

MS. SCHLECKER: Okay. But, do you remember signing any documents about [Derek's] custody?

MS. [BURNS]: Yes, I do. There was one document that I did not quite understand, that she summed it up in one sentence.

MS. SCHLECKER: Okay. What, what did she—what did she sum up? What did she say?

MS. [BURNS]: It was a document that she, she had explained to me that if I did not sign this document, [Derek] and I

would be on the streets and they would have to take [Derek] from me. If I signed the document, [Derek] would go with me.

MS. SCHLECKER: So, you thought you were signing a document that meant [Derek] would always stay with you?

MS. [BURNS]: Yes. That's the way that she had explained it to me. Those were her words.

Next, allegedly to meet federal funding requirements, the Division had Judy, then still a minor, sign a "consent" awarding Derek's custody to it. Again, the mother had neither advice nor counsel from any independent source before she relinquished custody of her child.

This document stated that a hearing would be held on April 2, 1984, at which time custody would be transferred to the Division unless contested by the mother. Although the consent form required specific factual bases for the transfer, the only reason listed was "he's [Derek] in placement because we have no place to stay." On January 30, after one aborted attempt by DCPS at an undesirable and unsatisfactory foster care arrangement, Judy and Derek were placed in the home of Margaret Draper.

Thereafter, Judy began job training and worked toward obtaining her GED at the Howard Skills Center. She narrowly missed passing the GED test. Although trained in the clerical field, the only job offered her through the school placement office was part-time work at a fast-food restaurant, which she accepted.

On April 4, after a hearing at which Judy was not present, and of which she had neither notice nor knowledge, a Master of the Family Court awarded custody of Derek to DCPS principally on the basis of the signed consent form.[4] Concurrently, the relationship between Judy and Mrs. Draper deteriorated. When Judy reached the age

---

**4.** As previously noted, the so-called consent form had indicated that a hearing would be held on April 2, not April 4.

of eighteen, on April 9, 1984, and relying on the terms of the "voluntary" placement agreement, she notified DCPS that she was terminating the arrangement and would leave the Draper home, taking her son with her to live temporarily at her natural father's house.

However, Mrs. Draper refused to let her leave with Derek. Judy then became hysterical, the police were called, and Derek was forcibly taken from her. Judy left the Draper house and Derek was given to the care of the Children's Bureau. Since that time, this mother and child have lived apart, and nothing was done by DCPS to provide Judy and Derek with other housing so that they could continue living together and maintain the close family relationship that had existed.

The Children's Bureau placed Derek in a foster home on April 16, and assumed the Division's responsibilities and duties to Judy and Derek through a purchase-of-care agreement. With no help from either her family or DCPS, Judy lived a transient lifestyle with little stability, despite her apparent good faith efforts to provide living and working arrangements of some permanence.

In June a Children's Bureau case worker, Patricia Jacobs, attempted to establish a plan with Judy for Derek's care. Jacobs proposed that Judy be evaluated and receive whatever counseling was indicated, that Judy might benefit from "parenting" classes, and that Judy would be expected to participate in weekly counseling and weekly visits with Derek at the Children's Bureau. The plan also called for Judy to secure adequate living quarters and suitable day care for Derek. Although the Children's Bureau, now acting in DCPS's stead, did nothing whatever to reunite this mother and child as a family unit, the plan rather disingenuously stated that the separation was because "no other joint placement was available." Understandably, the mother refused to sign this document.

Judy subsequently planned to marry a long-distance truck driver and move to Oklahoma. She submitted to a psychiatric evaluation, and agreed to have her fiance meet with Jacobs. Dr. Leon Green examined Judy, and reported that "from this interview I don't find anything seriously to contraindicate giving a chance to replacement of Derek with his mother." In a postscript, Green wrote: "Her life has been unstable, but there are enough positive signs and trends, that should she get settled in Oklahoma, replacement of Derek with her ought to be tried."

Judy then moved to Oklahoma in an attempt to establish a new life. Although unable to visit Derek, she remained in contact with Jacobs and asked about the well-being of her son. Unfortunately, the proposed marriage and its more permanent arrangements did not materialize. She then took a job in New Jersey as a housekeeper for a man and his two sons, receiving room, board and $40 per week. Thus, in November 1984, Judy and Patricia Jacobs again attempted to formulate a plan of care based on Judy's new circumstances. This proposal required Judy to maintain a stable living arrangement for six months, work with a local agency in seeking parental educational help, allow the agency to conduct an in-depth evaluation of her situation, and to reestablish regular patterns of visitation with Derek and meetings with her case worker.

Again, the mother's residence and position in New Jersey did not last. In January 1985, Judy moved to the Philadelphia area, where she supported herself with odd jobs and living with various friends. The Children's Bureau then changed its recommendation for Derek's future in March of 1985, and sought to terminate Judy's parental rights. The revised plan for Derek's care, dated April 11, 1985, stated:

"Miss [Burns] has not presented a reasonable plan for Derek's care. One essential component of a reasonable plan would be for her to maintain a stable living situation for at least six months. She has been at her present home since December 23, 1984. She lost her job in

January 1985. Derek has been separated from her since April 16, 1984. Thus, she has failed to present a plan for his care for a year."

Judy refused to sign this document.

At a Foster Care Review Board hearing on June 3, Hearing Officer Mary Lawson agreed with the Children's Bureau's decision to seek termination of parental rights, but ruled that the Bureau and DCPS were to arrange for counseling with specific treatment objectives and to continue their reunification efforts in the meantime. DCPS and the Children's Bureau sought *de novo* review of this decision from the Family Court.

This review was combined with the Family Court hearing in late August, 1985, on the petition for the termination of Judy's parental rights. The Family Court ruled in favor of DCPS and the Children's Bureau on the *de novo* review, noting in a footnote that the agency's decision to discontinue initiating reunification plans, and to simply cooperate with Judy's increased visitation requests pending the termination hearing, was appropriate under the circumstances.[5] The Family Court terminated Judy's parental rights.

The trial judge found that the Children's Bureau had shown by clear and convincing evidence that Judy was unable, or had failed, to plan adequately for Derek's needs. However, at the time of this hearing, Judy was a cabaret dancer earning approximately $200 to $250 per week. As an economic measure, and there is no suggestion otherwise, she shared a three-bedroom apartment with two males. She testified that there was room for Derek. Nonetheless, the court concluded that termination would be in the best interests of the child. Judy's appeal followed.

## II.

This Court will draw its own inferences and deductions, making its own findings and conclusions, whenever those of the trial judge are not supported by the record and are not the product of an orderly and logical deductive process. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972). However, where the issue on appeal is one of law, the scope of review is *de novo*. *Wife (J.F.V.) v. Husband (O.W.V., Jr.)*, Del.Supr., 402 A.2d 1202, 1204 (1979).

The Family Court may terminate parental rights when facts justifying such relief exist, based always on the best interests of the child. 13 *Del.C.* § 1108(a). *See Daber v. Division of Child Protective Services*, Del.Supr., 470 A.2d 723, 726 (1983); *Cline v. Hartzler*, Del.Supr., 227 A.2d 210, 212 (1967). DCPS must prove by clear and convincing evidence that termination of parental rights is essential to the child's welfare. *Patricia A.F. v. James R.F.*, Del. Supr., 451 A.2d 830, 832 (1982).

The grounds for the termination of parental rights are set forth in 13 *Del.C.* § 1103. Section 1103(5)a. provides, in part,

---

**5.** The text of the Family Court's footnote discussion reads as follows:

The Division of Child Protective Services has filed an appeal from the June 3, 1985 order of the Hearing Officer at a Foster Care Review Board Hearing which approved the plan of the Children's Bureau of Delaware, Inc. to proceed to a hearing on its termination of parental rights action previously filed, but conditioned this approval upon that agency's arranging for counseling with specific treatment objectives and frequent communication between agencies with a direction that the agency should not discontinue reunification efforts in the meantime. The basis for the Review de Novo is the obvious contradiction in plans for termination and reunification by the same agency. While the court's decision granting the petition to terminate the rights of both parents in their child renders this issue moot, such a decision whether to continue reunification efforts by an agency after a decision is made to seek a termination of parental rights should be made on a case by case basis depending on the facts presented. In this case, the Court finds that the agency's decision to discontinue initiating plans for reunification and to simply cooperate with the mother's requests pending the termination hearing, such as increased visitation with the child, was appropriate under the circumstances.
*In the Matter of Derek Wayne B., a Minor Child*, Delaware Fam.Ct., Nos. T–85–05–11 and D–1016 at 11 (Aug. 30, 1985) (James, J.).

for termination of parental rights under the following circumstances:

(1) Where the person(s) holding parental rights are not able, or have failed, to plan adequately for the child's physical needs or his mental and emotional health and development; and,

(2) the child has been in the care of an authorized agency for one year; and,

(3) the conditions which led to the child's placement persist, and it is unlikely that these conditions will be remedied in the near future.

Whether termination is in the child's best interests "necessarily depends upon the facts in the context in which the petition is presented." *Daber*, 470 A.2d at 726; *Matter of Three Minor Children*, Del.Supr., 406 A.2d 14, 19 (1979). The statutory criteria listed in 13 *Del.C.* § 722(a) for the determination of a child's best interests in a custody action apply with equal force to a termination proceeding. *Daber*, 470 A.2d at 727; *Matter of Three Minor Children*, 406 A.2d at 19. Section 722(a) requires the court to consider "all relevant factors including: (1) The wishes of the child's parent ...; (2) The wishes of the child ...; (3) The interaction and interrelationship of the child with ... any other person who may significantly affect the child's best interests; (4) The child's adjustment to his home, school, and community; and (5) The mental and physical health of all individuals involved." 13 *Del.C.* § 722(a).

■ The interests of the child remain paramount, and all questions of statutory interpretation must be settled in light of this objective. Moreover, where the best interests of the child and those of the parent conflict, the best interests of the child shall prevail. 13 *Del.C.* § 1113[6]; *Daber*, 470 A.2d at 727.

Based on these standards, the Family Court ruled that the best interests of the child would be served by termination of the mother's parental rights. The court found that Judy had consistently failed to comply with several case plans, and that her post-petition attempts to visit with Derek and to seek a return of custody were insufficient.

[T]he court, based upon the evidence presented, is satisfied that conditions which led to the child's placement with foster care in January of 1984 continue to persist with little likelihood that those conditions, namely the mother's failure or inability to achieve a stable lifestyle in one location for a reasonable period of time and to obtain a secure job commensurate with her job training level, will be remedied at an early date so that the child can be returned to her in the near future.

*Matter of Derek Wayne B.*, slip op. at 8. The court cited Judy's failure to make good-faith efforts at developing "parenting" skills or suitable living arrangements, and ruled that such inaction, even if unintentional, could not be condoned if it was adverse to Derek's best interests.

### III.

Stripped of all other considerations and factors, the bare facts may support a facile conclusion that this very young and immature mother had failed to plan adequately for Derek's needs within the meaning of Section 1103(5), and that the conditions which led to his placement still persisted when Judy's parental rights were terminated. However, the failure of DCPS and the Family Court to recognize and comply with both the minimal requirements of due process and the Child Welfare Act at several steps along the path to termination of the mother's parental rights, including the Children's Bureau's failure to meet its obligations under the Act, vitiate the trial court's judgment and mandate reversal.

**6.** The relevant provision of the statute provides:
This chapter is designed to achieve without undue delay the paramount objective of the best interest of the child, and all questions of interpretation shall be resolved with that objective in mind. Where there appears to be a conflict between the best interest of the parent(s) and the child, the best interest of the child shall prevail.
13 *Del.C.* § 1113.

■ The parental right is a sacred one. It does not depend on societal standards or mores of lifestyle, age, economic achievement or sex. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982). Certainly, it does not hinge on spoken or unspoken amorphous concepts of a "model" or "ideal" parental environment contrived by the mind of a social worker or judge. Were that the norm, few would qualify for a role and relationship that usually reflects success, not by the exhaltation of great achievements, but by an effort to minimize one's failures. In that spectrum there are many hues, and none remain constant. Thus, it is this State's policy that when governmental interference looms:

> Fewer rights are more sacred than those which derive from the parent-child relationship. A society which arrogates to itself the power to intervene and disrupt that relationship can do so only for the most compelling reasons necessary to correct or protect a child from circumstances which directly threaten or affect the minor's physical or emotional health . . .
>
> This places in the balance issues of parental rights versus responsibilities, and when there is an absence of performance of the latter, there is no presumption or compelling rule that the former are entitled to any overriding or paramount considerations in the scale of human values and relationships.

*Daber*, 470 A.2d at 726.

The powers, duties and functions of the DCPS have now been assigned to, and assumed by, the Department of Services for Children, Youth and Their Families (the Department) under 29 *Del.C.* §§ 9010 and 9012. The DCPS, however, continues as an agency of the Department. 29 *Del.C.* § 9006(1). By statute, the Department and its components must adhere to basic principles of due process in regard to all procedures which affect the rights of children and their families. Thus, 29 *Del.C.* § 9003(11), commands the Department

[t]o establish, implement and follow procedures and standards compatible with due process of law with respect to the removal of a child from his home, a change in the placement of a child who is under the supervision or custody of the Department, and any other actions by the Department that may affect the legal rights of a child and his or her family . . .

This judicial policy and statutory mandate are consistent with the guidance from the United States Supreme Court that:

> "This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' "

*Lassiter v. Dept. of Social Services of Durham County*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–60, 68 L.Ed.2d 640 (1981), (*quoting Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972).

The Supreme Court later reaffirmed this principle:

> "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."

*Santosky*, 455 U.S. at 753, 102 S.Ct. at 1394–95.

The due process standards applicable here turn on the balancing of three factors: (1) the private interest that will be affected by the official action; (2) the risk that there will be an erroneous deprivation of the interest through the procedures used and the probable value of any additional or substitute procedural safeguards; and, (3) the government interest involved, including the added fiscal and administrative burdens that additional or substitute procedure would require. *Santosky*, 455 U.S. at 754, 102 S.Ct. at 1395; *Mathews v. Eldridge*,

424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

However, our decision does not derive from the United States Constitution. The applicable Delaware principles are concomitant with, but not dependent upon, like concepts of federal constitutional law. Thus, they stand on independent judicial and statutory bases, clearly enunciated by this Court and the General Assembly as mandated by the due process standards of the Delaware Constitution. Del. Const. art. I., §§ 7 and 9; 29 *Del.C.* § 9001, *et. seq. See Daber*, 470 A.2d at 726.

Here, the due process issues begin with Judy's "voluntary" execution of the placement agreement on January 4, 1984, followed by the so-called "consent", signed on January 30, 1984, purporting to "voluntarily" transfer Derek's custody to the Division. These documents of vast import were executed by a minor without the assistance of counsel, a guardian *ad litem,* or any independent person standing in *loco parentis.* While the Division technically had custody of Judy, it could hardly satisfy due process standards by any advice it rendered in getting her to convey her own parental rights to the Division.

Judy's need for some form of independent advice was amply demonstrated in the course of the next eight months. What seemed to be a mere bureaucratic condition of locating a joint home for mother and child became the lever by which DCPS sought to permanently separate the two.

Judy, led to believe that she could revoke her consent to the transfer of custody, attempted to leave the Draper house with her child. Instead, the two were forcibly separated on the basis of an *ex parte* order granting custody to the DCPS on April 4, 1984 by a Master, on a date not previously specified (the transfer of custody signed by Judy listed April 2 as the hearing date),

without a summons or waiver of notice as to the actual date.[7]

Applying the *Eldridge* factors, we note that the private interest in the parent-child relationship is quite powerful; that the risk of erroneous deprivation, especially when seeking the renunciation of such rights from a minor, is considerable; and that the additional burden of providing counsel or a guardian *ad litem* under such circumstances cannot be said to outweigh the first two factors.

■ Here, the primary failure of due process began with the Division's bureaucratic requirement that a minor, without the benefit of any assistance from some independent representative, relinquish custody of her child for 90 days as a prerequisite to finding desperately needed housing. This circumstance was aggravated and compounded by the ex parte proceeding in the Family Court on April 4, awarding custody to DCPS without any summons or notice reciting the time and place of the hearing, as well as other information required by Family Court Rule 110(a). This elementary lack of minimal due process standards vitiates the entire set of proceedings and mandates reversal. But the matter does not end there.

### IV.

Even adherence to rules of due process could not cure the equally serious failures of the State to meet its obligations under the federal Child Welfare Act. Those requirements are matters of first impression before us, and this record forces us to address them irrespective of due process considerations.

The Act is a substantial step toward federal child welfare reform. Studies undertaken in the last decade highlighted several important problems facing children who are at risk of placement or who are already

---

7. Family Court Rules then in effect required either the issuance of a summons bearing, *inter alia,* the date of the service, or a promise in writing to appear at the hearing, absent a voluntary appearance or a waiver of service. Del. Fam.Ct. Rule 110(a), (c)(2). Here, there was no summons, but only a written acknowledgment by Judy of a hearing on an incorrect date, signed by a minor without the guidance of an attorney or guardian *ad litem.*

in out-of-home care. Children are being placed in foster care without first providing alternative services that may help keep the families together. State agencies often failed to provide case plans and reviews for foster children, thus unnecessarily prolonging the length of foster care. Federal dollars encouraged the inappropriate separation of children from their families and discouraged their return home. Funds for alternatives to out-of-home care were not provided.

To stimulate state-wide reform of these problems, the Child Welfare Act was enacted on June 17, 1980. This legislation redirects fiscal incentives by imposing, as a condition of continued federal funding, several specific substantive reforms on state agencies to ensure permanent families for children.[8]

■ In order to qualify for the funding it receives from the federal government, DCPS must follow the guidelines prescribed by the Act. Funds are available for both child welfare services (under Title IV–B, §§ 620–28) and for foster care and adoption assistance (under Title IV–E, §§ 670–76). If the State is to qualify for reimbursement funds under Title IV–E, it must show that for each child as to whom foster care expenditures have been made, there has been a judicial determination that all reasonable efforts were extended (1) to prevent the necessity of removing the child from his or her natural parents, or (2) to reunify the parents and the child. In the case of a voluntary placement, there must be a finding that the placement is in the best interests of the child. 42 *U.S.C.* §§ 672(a)(1), (e); 671(a)(15).[9] Additionally, the State must show that each child has a case plan which qualifies under § 675(1) and which is reviewed on a semi-annual basis. 42 U.S.C. § 671(a)(16).[10]

Moreover, Delaware has its own statutory mandate in 29 *Del. C.* § 9003(3), requiring "preplacement, preventive services and

---

**8.** *Foster Children in the Courts, supra,* n. 1, at 575–77.

**9.** The relevant sections of the statutes provide:
(a) Each State with a plan approved under this part shall make foster care maintenance payments (as defined in section 675(4) of this title) under this part with respect to a child who would meet the requirements of section 606(a) of this title or of section 607 of this title but for his removal from the home of a relative (specified in section 606(a) of this title), if—
(1) the removal from the home occurred pursuant to a voluntary placement agreement entered into by the child's parent or legal guardian, or was the result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child and (effective October 1, 1983) that reasonable efforts of the type described in section 671(a)(15) of this title have been made;
   \* \* \* \* \* \*
42 *U.S.C.* § 672(a)(1).
(c) *No Federal payment* may be made under this part with respect to amounts expended by any State as foster care maintenance payments under this section, in the case of any child who was removed from his or her home pursuant to a voluntary placement agreement as described in subsection (a) of this section and has remained in voluntary placement for a period in excess of 180 days, unless there

has been a judicial determination by a court of competent jurisdiction (within the first 180 days of such placement) to the effect that such placement is in the best interests of the child.
   \* \* \* \* \* \*
42 *U.S.C.* § 672(e).
In order for a State to be eligible for payments …, it shall have a plan approved by the Secretary which—
(15) effective October 1, 1983, provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home …
   \* \* \* \* \* \*
42 *U.S.C.* § 671(a)(15).

**10.** The statute provides in relevant part:
In order for a State to be eligible for payments …, it shall have a plan approved by the Secretary which—
(16) provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meet the requirements described in section 675(5)(B) of this title with respect to each such child …
   \* \* \* \* \* \*
42 *U.S.C.* § 671(a)(16).

reunification services" for children and their families.[11] The statute also requires written case plans and semi-annual reviews of such plans. 29 *Del.C.* § 9003(4), (5).[12]

Here, the record demonstrates that DCPS and the Children's Bureau failed to provide Judy with meaningful case plans outlining reunification guidelines. Nor did the agencies make reasonable efforts to provide preventive and/or reunification services.

For a case plan to so qualify under § 675(1), the plan must describe where the child will be placed, contain a discussion of the appropriateness of the placement, and demonstrate a plan for "assuring that the child receives proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate the return of the child to his own home or the permanent placement of the child ..." 42 *U.S.C.* § 675(1). When this section is read together with the requirements of § 671(a)(15)—that reasonable efforts must be made either to reunite the family or prevent placement—it is clear that some affirmative services must be provided if the State and the Department are to qualify for federal funds.

■ The case plans drafted by DCPS, from the time of Derek's "voluntary" placement until DCPS changed its goal to adoption, consistently indicated that the sole reason for the transfer of custody was due to lack of housing. The case plan failed to indicate what efforts or services the Children's Bureau would provide in order to reunite the family under one roof.

The inadequacy of the case plans developed by the Children's Bureau is illustrated by the June 30, 1984 proposal. Paragraph seven states that Judy "might also benefit from parenting classes." The Children's Bureau failed to explain why such classes were necessary, and significantly, did not indicate that attendance at such classes constituted a prerequisite to the reunification of the family. Such open-ended language indicates that the Children's Bureau did not have reunification foremost among its goals.

The sole reason for transferring custody of Derek to the State was due to a lack of housing. The DCPS and the Children's Bureau were obliged to make all reasonable efforts to prevent Derek's removal from his mother, and to reunify the family after separation. The legislative history of the Child Welfare Act emphasizes the importance of the "reasonable effort" requirement:

> [T]hese sections are aimed at making it clear that States must make reasonable efforts to prevent the removal of children from their homes. In the past, foster care has often been the first option selected when a family is in trouble: the new provisions will require States to examine alternatives and provide, wherever

---

11. The relevant portion of the statute provides:
  The Department of Services for Children, Youth and Their Families shall have the following powers, duties and functions:
  *   *   *   *   *   *
  (3) To provide for a variety of facilities and services to children, youth and their families which shall include, but not be limited to the following:
  b. Preplacement, preventive services and reunification services;
  *   *   *   *   *   *
  29 *Del.C.* § 9003(3).

12. The relevant aspects of this statute are:
  *   *   *   *   *   *
  (4) To prepare and maintain a written case plan for each child under its supervision or custody, which shall include but not be limited to a description of the child's problems, the care and treatment of the child and any other services to be provided to the child and his or her family; each case plan must be designed to achieve any placement of the child outside of his or her home in the least restrictive setting available and in close proximity to the child's home, consistent with the best interests and special needs of the child;
  (5) To conduct a written review at least every 6 months of the case plan for each child under its supervision or custody for the purpose of determining whether the plan is appropriate;
  *   *   *   *   *   *
  29 *Del.C.* § 9003(4), (5).

feasible, home-based services that will help keep families together, or help reunite families ... Far too many children and families have been broken apart when they could have been preserved with a little effort. Foster care ought to be a last resort rather than the first. 126 Cong.Rec. S6942 (daily ed. June 13, 1980) (statement of Sen. Cranston).

DCPS could have subsidized placement of Judy and Derek in another foster home for six months past Judy's eighteenth birthday. However, the agency did not offer this option. DCPS made no efforts to prevent Derek's placement in a foster home and did not assist Judy in obtaining alternative, subsidized housing. The conclusion, thus, is inescapable that the State and its agents failed in their clearly mandated duties to prevent the separation, or to reunify Judy and Derek.

■ In future cases of this type the Family Court must ensure meaningful compliance with the Child Welfare Act of 1980, 42 *U.S.C.* §§ 608, 620–28, 670–76 (1982), and the appropriate Delaware law, 29 *Del.C.* § 9003(2)a and (3). In doing so, the Family Court must interpret and apply the federal and state statutes to determine their application to a given case. Thus, where termination of parental rights is sought primarily on the ground that a parent has failed, or was unable, to plan adequately for a child's needs, and if that rather vague criterion is to survive constitutional scrutiny, the trial court is required to make appropriate findings of fact and conclusions of law as to the State's *bona fide* efforts to meet its own obligations. Without that, no case of this sort, and all its enormous consequences, will pass appellate muster.

## V.

Judy also challenges the trial court's dicta allowing the DCPS to discontinue reunification efforts when the decision to seek termination of parental rights is reached. The mother claims that such a holding circumvents the need for "judicial dispositions and the 'case review system' built into the Act."

■ We see no fundamental error in permitting the agency to discontinue reunification efforts if the State has acted properly to terminate parental rights. In such circumstances the State assumes an adversarial role vis a vis the parents. To require continued reunification efforts, while contending for termination, is illogical.

In this case, however, it is quite clear that neither DCPS nor the Children's Bureau exerted the required efforts to reunify Judy and Derek, or to prevent their separation. To give judicial sanction to such circumstances would be inappropriate.

In conclusion, the failure of the Department to adhere to minimum standards of due process rendered invalid the initial custody award and the subsequent termination of Judy's parental rights. The mandates and principles of the federal and state statutes were not observed. Accordingly, the decision of the Family Court is REVERSED. Custody of Derek is returned to his mother.