IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KAREN GIBSON, | § | |
| | § | No.   604, 2016 |
| Respondent Below, | § | |
| Appellant, | § | Court Below:   Family Court of |
| | § | the State of Delaware |
| v. | § | File No. CN15-03033 |
| | § | Petition No. 16-13203 |
| DEPARTMENT OF SERVICES FOR | § | File No. CN15-02126 |
| CHILDREN AND THEIR FAMILIES | § |        16-09-07TN |
| and MATTHEW BARNES, and | § | Petition Nos. 15-07560 |
| MICHELLE BARNES, | § |        16-27360 |
| | § | File No. CN15-02121 |
| Petitioners Below, | § |        16-09-06TN |
| Appellees. | § | Petition Nos. 15-07539 |
| | § |        16-27619 |
| | § | |

Submitted:  October 11, 2017
Decided:   November 16, 2017

Before **Valihura**, **Vaughn**, and **Traynor**, Justices.

### O R D E R

On this 16ᵗʰ day of November 2017, upon consideration of the parties' briefs

and the record on appeal, it appears that:

(1)     Appellant, Karen Gibson[1], appeals from a Family Court order granting

permanent guardianship of one of her children to the child's paternal grandparents

and terminating her parental rights in two other children. She makes two claims on

appeal.   She contends: (1) the Family Court erred in concluding by clear and

---

[1]  A pseudonym was assigned on appeal pursuant to Supr. Ct. R. 7(d).

convincing evidence that the permanent guardianship and termination of her parental rights was in the best interest of the children; and (2) the Family Court erred in concluding by clear and convincing evidence that she failed to plan for the needs of the children.

(2) Karen Gibson is the mother of Sandy G., born November 16, 2009, and Ivy R. and Israel R. ("Twins"), born August 25, 2012.[2] The children were removed from their mother's care on March 20, 2015, when the Department of Services for Children, Youth and Their Families ("DSCYF") filed for and received temporary custody of all three children.

(3) DSCYF was contacted on March 18, 2015, regarding concerns of medical neglect of the Twins and physical abuse of Sandy. A decision making meeting was held the same day. The Twin's physician, Deborah Consolini, M.D., expressed concerns about the medical wellbeing of the Twins. The Twins were born premature with developmental complications causing them to spend the first two years of their lives in a hospital setting. The Twins were discharged to Gibson's care in 2014 but Dr. Consolini found they were not attending scheduled medical appointments and not making developmental progress. All three children resided

---

[2] Unless otherwise indicated, all facts are taken from the Family Court's opinion and order below, attached to Appellant's Opening Brief as Exhibit 1.

2

with Gibson and Mr. R in a garage like structure on the maternal grandparent's property. Gibson agreed to a safety plan under which the children would move into the maternal grandparent's main home and Gibson would take the Twin's to all medical appointments.

(4) On March 19, 2015, a DSCYF worker met with Sandy at her daycare regarding physical abuse allegations, and Sandy was taken to A.I. DuPont Hospital to be examined. She presented with bruising to her forehead, arms and legs, including a bruise to her inner right thigh resembling a belt buckle, which Sandy indicated were inflicted by Mr. R. The following day DSCYF visited the maternal grandparent's home and found that Gibson had not moved the children into the main home as required by her safety plan. DSCYF's emergency custody petition was filed and granted by the Family Court that day.

(5) On March 25, 2015, a Preliminary Protective Hearing was held. Gibson was present but Mr. R was not. The Family Court heard evidence regarding the medical neglect of the Twins and allegations of the physical abuse of Sandy by Mr. R. The Family Court found probable cause existed that the children were dependent and found it in their best interest to remain in DSCYF custody.

(6) On April 22, 2015, an Adjudicatory Hearing was held. Gibson was present but Mr. R was not. His whereabouts were unknown but DSCYF suspected

3

he was living in Philadelphia. Gibson denied knowing his whereabouts or speaking to him since the children entered DSCYF's custody. Gibson stipulated to a finding of dependency. In addition, Gibson entered into a case plan which included: obtaining and maintaining stable housing and income; completing a parent education course; completing mental health and substance abuse evaluations and any recommended treatment; completing domestic violence and anger management courses; attending the children's medical appointments; and attending visitation with the children.

(7) On May 19, 2015, a Dispositional Hearing was held. Gibson was present but Mr. R was not. His location was not known and a warrant had been issued for his arrest relating to Sandy's abuse. Gibson stipulated to a finding of dependency. Gibson's DSCYF treatment worker testified that she provided Gibson information on Section 8 housing options, contact information for domestic violence counseling and anger management programs, and referred her to psychological and substance abuse evaluations. On this date, the paternal grandparents filed a Petition for Permanent Guardianship of Sandy.

(8) On September 24, 2015, a Review Hearing was held. Gibson and Mr. R were present. Mr. R had been arrested in Philadelphia for second degree assault of Sandy and endangering the welfare of a child. At the time of this hearing he was

4

incarcerated pending trial. Gibson was living at a home in Philadelphia with relatives of Mr. R but she denied knowing his whereabouts before his arrest. Gibson's DSCYF treatment worker told the Family Court that Gibson had attended a case planning meeting on July 15, 2015, but failed to attend the next scheduled meeting on September 22, 2015. DSCYF presented evidence that Gibson was still residing in Philadelphia. The Family Court found the children remained dependent by a preponderance of the evidence.

(9) On November 30, 2015, a Second Review Hearing was held with only Gibson present. Mr. R was still incarcerated. Gibson had returned to the maternal grandparent's home. She was living in the upstairs of their main house. Gibson was to notify DSCYF when the children's beds were moved to the main home. DSCYF presented evidence that Gibson had cancelled a case planning meeting scheduled on October 5, 2015, but she had attended an Individualized Education Program meeting for the Twins. The Family Court found the children remained dependent by a preponderance of the evidence.

(10) On December 21, 2015, Mr. R pled guilty to second degree assault of Sandy and received a term of incarceration. A no-contact order was issued for Sandy.

(11) On February 11, 2016, the DSCYF Permanency Planning Committee

met and recommended a goal change to Termination of Parental Rights ("TPR") and adoption for the Twins. As to Sandy, the Committee recommended a Permanent Guardianship with the paternal grandparents.

(12) A Third Review Hearing was held on February 22, 2016. Gibson and Mr. R were present along with the Barnes. Gibson's DSCYF treatment worker testified that she spoke with Gibson about the importance of the counseling and treatment programs in her case plan. Gibson advised she planned to attend domestic violence and anger management classes. The Family Court found the children continued to be dependent by a preponderance of the evidence.

(13) Gibson's DSCYF treatment worker conducted a home assessment of the maternal grandparent's main house in February 2016. DSCYF determined the housing to be appropriate, but Gibson's case plan still had not been completed. DSCYF filed Motions to Change the Goal on May 3, 2016, to reflect the changes agreed upon by the Planning Committee at its February 11, 2016, meeting. The maternal grandmother subsequently filed a Petition for Guardianship of the Twins and the paternal grandparents filed a Petition for Permanent Guardianship of Sandy.

(14) A Permanency Hearing was held May 16, 2016, at which Gibson and Mr. R were present. The Court granted DSCYF's Motions to Change as to the Twins based on Gibson's failure to complete her case plan and concerns about her

6

ability to protect the children from domestic violence. The Family Court took notice of Gibson's appropriate housing, her attendance at mental health appointments, and her efforts to gain employment, and kept a concurrent goal of reunification for all the children.

(15) The maternal grandmother's Petition for Guardianship of the Twins was denied on September 16, 2016. The Family Court heard argument on DSCYF's Petitions for TPR for the Twins and the paternal grandparents Permanent Guardianship of Sandy on October 26, 2016 and November 2, 2016. The Family Court found the paternal grandparents were eligible to serve as Sandy's permanent guardians and they established grounds for permanent guardianship by clear and convincing evidence.[3] Further, the Family Court found by clear and convincing evidence that Gibson failed to plan for the children's needs and that DSCYF made reasonable efforts to reunite the family. The Family Court terminated Gibson's parental rights in the Twins based on her failure to plan and the children's best interests.[4]

(16) First, we agree on the record before us that the Family Court did not err when granting the paternal grandparents' Petition for Permanent Guardianship of

---

[3] Sandy's father consented to the paternal grandparents' petition for permanent guardianship.
[4] The Twins father, Mr. R, consented to termination of his parental rights.

Sandy. In granting a permanent guardianship request, a trial judge must find by clear and convincing evidence that one of the statutory grounds for termination of parental rights set forth in 13 *Del. C.* § 1103(a) has been met.[5] The court then decides whether permanent guardianship is in the best interest of the child.[6] The court must also find that adoption is not possible or appropriate and the proposed guardian is suitable to serve as a guardian.[7] When reviewing whether evidence justifying a termination of parental rights has been established, this Court conducts a "review of the facts and law, as well as the inferences and deductions made by the trial court."[8] "We will not disturb a trial judge's factual findings unless they are clearly erroneous and justice requires that they be overturned."[9] "Moreover, this Court will not substitute its own opinion for the inferences and deductions made by the Trial Judge where those inferences are supported by the record and are the product of an orderly and logical deductive process."[10] Our review is limited to an abuse of discretion when the trial judge has correctly applied the appropriate law.[11] "To the extent that the issues on appeal implicate rulings of law, we conduct a *de*

---

[5] 13 *Del. C.* § 2353 (a)(1).
[6] § 2353 (a)(3).
[7] § 2353 (a)(2)–(5).
[8] *Powell v. Dep't. of Servs. For Children, Youth and their Families*, 963 A.2d 724, 730 (Del. 2008).
[9] *Arthur-Lawrence v. Div. of Family Servs.*, 2005 WL 2397523, at *5 (Del. Sept. 27, 2005).
[10] *Solis v. Tea*, 468 A.2d 1276, 1279 (Del. 1983).
[11] *Powell*, 963 A.2d at 731.

*novo* review."[12]

(17) Here, the trial court granted the paternal grandparents' Petition for Permanent Guardianship of Sandy after conducting a thorough review and providing an explanation of every statutory factor required under 13 *Del. C.* §2353. The trial court found by clear and convincing evidence that Gibson had failed to meet the 13 *Del. C.* §1103(a) statutory ground requiring her to adequately plan for her children. The trial court found the paternal grandparents' preference for guardianship over adoption in an effort to maintain their grandparent-grandchild relationship with Sandy to be appropriate.

(18) The trial court conducted a section-by-section best interest analysis under 13 *Del. C.* § 722, finding by clear and convincing evidence that permanent guardianship was in Sandy's best interest. Of the eight factors in the best interest test, the court found factors 3, 4, 5, 6, 7, and 8, in favor of granting permanent guardianship.

(19) The first factor is the wishes of the child's parent as to the child's custody and residential arrangement. Here, Gibson wanted custody of Sandy and, as such, this was the only factor the court found in her favor.

(20) The second factor is the wishes of the child as to custody and residential

_____

[12] *Id.* at 730-31.

9

arrangement. Here, Sandy was only six years old and no request was made for the court to hear her wishes. The court found this factor did not apply.

(21) The third factor is the child's interactions and relationships with the parents, family, and anyone else living with the family unit. Here, evidence was presented that Sandy was living with the paternal grandparents in a loving relationship. Sandy was placed with the paternal grandparents shortly after March 2015 when she was removed from her mother's care. DSCYF presented evidence that Sandy was "strongly bonded" to the paternal grandparents and that during home visits Sandy interacted with the grandparents as if they were her parents. Sandy has a good relationship with the paternal grandparents' adult daughter who frequently visits, takes Sandy to McDonalds, or brings Sandy to visit her friend who has a daughter the same age as Sandy.

(22) The trial court found Gibson sporadically visited Sandy. The paternal grandparents stated Sandy would go months without asking about Gibson or seeing her. Gibson testified Sandy would be excited to see her and DSCYF reported Sandy would allow mother to physically interact with her. The paternal grandparents testified Sandy's behavior was defiant and disrespectful following visits with Gibson. Sandy has seen the Twins during her visits with Gibson. Gibson has two older children who had not visited with Sandy. The maternal grandparents have not

visited since Sandy entered DSCYF custody.

(23) The fourth factor is the child's adjustment to home, school, and community. Here, evidence was presented that Sandy initially was clingy, afraid of the dark, and exhibited behavioral issues, all of which have been addressed during Sandy's and the paternal grandparents' joint counseling sessions with Sandy's counselor. Sandy is the "teacher's helper" at school and gets along with her classmates. It was reported that she missed one day of school over the past year. The paternal grandparents testified that Sandy likes to sing, dance, and do gymnastics, and they encourage her to be an active participant in their church.

(24) The fifth factor is the mental and physical health of all individuals involved. Here, when Sandy moved in with her paternal grandparents, she had cavities and decaying teeth. The paternal grandparents had many of her baby-teeth removed and Sandy now regularly sees a dentist. Sandy also has asthma which is maintained through regular use of an inhaler. Under the paternal grandparents' care, Sandy continued to see a counselor on a monthly basis, sometimes bi-weekly, to address behavioral issues.

(25) The sixth factor is the past and present compliance by the parents with their rights and responsibilities to their children. Here, Gibson has sporadically visited Sandy. She has provided no financial support to the paternal grandparents.

11

Sandy remained in DSCYF custody "due to repeated findings of dependency by a preponderance of the evidence."

(26) The seventh factor is evidence of domestic violence. Here, Sandy entered DSCYF's custody with extensive bruising and a mark on her inner thigh resembling a belt buckle. Gibson's love interest, Mr. R, was charged with abusing Sandy. Gibson maintained the injuries caused by Mr. R were an accident, and that he only intended to scare Sandy. Further, the court heard testimony that Gibson may have been maintaining an ongoing relationship with Mr. R. and that Gibson allowed Sandy to have telephone contact with Mr. R. The paternal grandparents admitted to occasionally spanking Sandy. The paternal grandfather admitted to a probation before judgment sentence imposed eight years prior for offensive touching and third degree assault after he slapped his adult-aged daughter. The paternal grandfather also admitted an incident of domestic violence with his first wife over twenty years ago.

(27) Finally, the eighth factor is the criminal history of any party or any resident of the household. Here, the paternal grandfather has the offensive touching, third degree assault charges, and additional motor vehicle infractions. The paternal grandmother has no Delaware criminal history. Gibson was convicted of shoplifting twice since the children entered DSCYF custody and has a 2012

12

conviction for third degree assault. At the time of the Family Court's October 26, 2016, hearing Gibson had an active capias for failure to appear relating to pending charges of theft under $1,500.

(28) After the best interest analysis under 13 *Del. C.* § 722, the court examined the emotional, mental, physical, and financial suitability of the paternal grandparents to serve as Sandy's permanent guardian.[13] Here, the court found the paternal grandparents had no physical or mental health issues that would prevent them from caring for Sandy. The couple received disability income and Social Security income. They own their home and have a mortgage, although they were a month behind on utility payments. They acknowledged the requirement to maintain sufficient income in order to financially provide for Sandy. Sandy had been in the paternal grandparents' care for over a year at the time of the hearing and they testified they are committed to assuming all rights and responsibilities for raising Sandy until the age of majority.

(29) The Family Court granted the paternal grandparents' Petition for Guardianship of Sandy after thoroughly analyzing all statutory requirements of 13 *Del. C.* § *2353.* The court found: Gibson eligible to have her parental rights in Sandy terminated under one of the sections in 13 *Del. C.* § 1103(a); Permanent

---

[13] 13 *Del. C.* § 2353 (a)(4).

Guardianship was in Sandy's best interest; and the paternal grandparents were suitable to become Permanent Guardians. The record supports the Family Court's findings.

(30) Next, we agree on the record before us that the Family Court did not err in terminating Gibson's parental rights in the Twins. Under Delaware law, a trial judge must conduct a two-step analysis when deciding whether or not to terminate parental rights.[14] First, the judge must determine whether there is clear and convincing evidence that one of the grounds for termination enumerated in 13 *Del. C.* § 1103(a) has been met.[15] If one of the enumerated grounds for termination has been met, the trial judge next determines if there is clear and convincing evidence that termination of parental rights is in the best interest of the child as defined under 13 *Del. C.* § 722.[16] "[W]here termination of parental rights is sought primarily on the ground that a parent has failed, or was unable, to plan adequately for a child's needs . . . the trial court is required to make appropriate findings of fact and conclusions of law" regarding the State's compliance with the Child Welfare Act of 1980[17] and 29 *Del. C.* §§ 9003.[18]

---

[14] *Powell v. Dep't. of Servs. For Children, Youth and their Families*, 963 A.2d 724, 731 (Del. 2008).
[15] *Id.*
[16] *Id.*
[17] 42 U.S.C. §§ 608, 620-28, 670-76 (1982).
[18] *Matter of Burns*, 519 A.2d 638, 649 (Del. 1986).

(31) Here, the record supports the Family Court's determination, by clear and convincing evidence, that Gibson had failed to plan for the physical and mental needs of Sandy and the Twins.[19] All three children had been in DSCYF's custody for over one year and seven months at the time of the hearing.[20] The court found Gibson had failed to satisfy her case plan that was signed on April 2, 2015.

(32) The Family Court heard evidence about Gibson completing the housing portion of her case plan but noted concern over her pattern of leaving the home in favor of residing with Mr. R.

(33) Gibson remained unemployed and the court found she had not demonstrated the ability to support the children financially. This was evident from her struggles to support herself in light of her inability to pay the necessary $14 fee to the Visitation Center to visit her children while in DSCYF care. Further, she intended to rely upon Social Security income for the benefit of the Twins that was unascertainable. Gibson obtained additional shoplifting convictions while the children were in DSCYF care. The court noted Gibson had not been attending all the children's doctors' appointments, specifically for the Twins who have special medical needs. Gibson had gone periods of three months and two months without

---

[19] 13 *Del. C.* § 1103 (a)(5).
[20] § 1103 (a)(5)1.

15

visiting the children since they entered the State's care.

(34) The Family Court expressed concern over the domestic violence elements of Gibson's case plan. Based on evidence at the Permanency Hearing, the Family Court determined Gibson did not demonstrate the ability to implement the skills or knowledge she learned, if any, from her domestic violence and anger management courses. Gibson refused to assign any blame to Mr. R for injuring Sandy and continued to insist the buckle shaped bruise on her thigh was the result of an accident. Gibson facilitated phone contact between Mr. R and Sandy in violation of the no-contact order that was in place. Evidence was presented that Gibson was carrying on a relationship with Mr. R. A DSCYF intern testified to seeing Gibson and Mr. R together on a SEPTA train from Philadelphia to Wilmington just two weeks prior to the Family Court's Permanency Hearing. The court was troubled that Gibson moved to Philadelphia while Mr. R was wanted for abusing Sandy instead of remaining at the maternal grandparent's home to work on reunification with the children. The court found Gibson had not shown the ability to protect the children from domestic violence and found she would likely expose them to Mr. R if they were returned to her custody.

(35) In addition to finding that Gibson failed to plan for the children's care, the code requires clear and convincing evidence that one or more statutory

conditions be met.[21] Here, the Family Court analyzed all five factors under 13 *Del. C.* § 1103(a)(5)–even though only one factor is necessary to be found by clear and convincing evidence–and found factors 1, 4, and 5 applied. Section 1103(a)(5)1 requires the children be in DSCYF custody for at least one year. Here, Gibson's children had been in the State's custody for one year and seven months.

(36) After determining one of the statutory grounds of 13 *Del. C.* §1103(a) has been met, the Family Court must determine if the TPR is in the child's best interest under 13 *Del. C.* § 722. The factors are the same as those in the analysis regarding the paternal grandparents' Petition for Permanent Guardianship of Sandy. The court analyzed these factors as to the Twins and found factors 4, 5, 6, 7, and 8 supported granting the TPR.

(37) The first factor is the wishes of the child's parent as to the child's custody and residential arrangement. Here, Gibson wanted custody of the Twins. This was the only factor the court found in her favor. The court noted she did not take the adequate steps to reunite with the children for the nearly two years they were in DSCYF custody.

(38) The second factor is the wishes of the child as to custody and a residential arrangement. Here, the Twins were only four years old and no request

---

[21] *Id.*

was made for the court to hear their wishes. The court found this factor did not apply.

(39) The third factor is the child's interactions and relationships with the parents, family, and anyone else living with the family unit. Here, the Twins resided in a hospital for the first two years of their lives. After their discharge they remained with Gibson for only eight months before DSCYF removed them from her custody. The court found the Twins have spent more time in a hospital and State custody during their lives than with Gibson. Gibson sporadically visited the Twins during their time in DSCYF custody, sometimes going up to three months without seeing them. The maternal grandparents and Gibson's older son did not visit the Twins while they were in foster care.

(40) The fourth factor is the child's adjustment to home, school, and community. Here, the court found Gibson failed to provide a suitable living environment for the children. In DSCYF care, the Twins have been attending daycare and have been making developmental progress.

(41) The fifth factor is the mental and physical health of all individuals involved. Here, while in foster care, the Twins have received all necessary medical treatment and have demonstrated strides in physical and occupational therapy. They improved their language, motor skills, and are able to run and speak. One

Twin was on strict dietary guidelines when he entered DSCYF care but had since been weaned off the requirements. DSCYF contended the Twins medical care is a full-time job with significant commitments. Gibson had not been attending medical appointments while the Twins were in DSCYF custody. She admitted to not knowing their current medical needs.

(42) The sixth factor is the past and present compliance by the parents with their rights and responsibilities to their children. Here, the Twins are in foster care because of Gibson's failure to provide care for them. Gibson failed to complete her case plan, did not have employment, and had not been providing financial support for the children.

(43) The seventh factor is evidence of domestic violence. Here, the Twins' entered DSCYF custody partly because of the abuse of their sister by Mr. R.

(44) Finally, the eighth factor is the criminal history of any party or any resident of the household. Here, Gibson was convicted of shoplifting twice since the children entered DSCYF custody and has a 2012 conviction for third degree assault. At the time of the Family Court's October 26, 2016, hearing Gibson had an active capias for failure to appear relating to pending charges of theft under $1,500.

(45) Finally, after finding one of the statutory grounds for TPR exists and

determining TPR to be in the children's best interest, the court must conclude whether DSCYF made reasonable efforts to reunify Gibson with her children. Here, the Family Court found DSCYF presented Gibson with a reasonable case plan which addressed housing, finances, domestic violence, mental health, substance abuse, parenting, legal issues, and visitation. Gibson failed to appear for DSCYF case planning meetings and visitation with the children multiple times. DSCYF representatives testified to often having problems reaching mother via email or phone. Gibson failed to attend medical appointments after DSCYF gave her notice. The Visitation Center deactivated Gibson's case for her failure to appear for visitation dates.

(46) The Family Court thoroughly analyzed each element of 13 *Del. C.* §1103(a) and clear and convincing evidence was presented that TPR was in the best interest of the Twins. The record supports the Family Court's order.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED.

BY THE COURT:

/s/   James T. Vaughn, Jr.
Justice

20