2000 ME 99

**In re HEATHER C.**

Supreme Judicial Court of Maine.

Argued May 1, 2000.
Decided May 25, 2000.

Patricia A. Peard (orally), Bernstein, Shur, Sawyer & Nelson, P.A., Brenda M. Buchanan, Warren Currier & Buchanan, LLC, P.A., Portland, for appellant.

Andrew Ketterer, Attorney General, Matthew Pollack, Asst. Attorney General (orally), Patricia Stevens, Asst. Attorney General, Augusta, for appellee.

Charles Veilleux, Skowhegan, Guardian ad Litem.

Charles Reeves, Waterville, for father.

Before CLIFFORD, RUDMAN, DANA, SAUFLEY and ALEXANDER, JJ.

SAUFLEY, J.

[¶ 1] The mother of Heather C. appeals from an order entered in the District Court (Somerset, *Clapp, J.*), pursuant to 22 M.R.S.A. §§ 4035, 4036 (1992 & Supp. 1999), finding that Heather was in circumstances of jeopardy and awarding custody to the Department of Human Services. On appeal, the mother contends that certain provisions of the Child Protection Act, 22 M.R.S.A. §§ 4001–4094 (1992 & Supp.

1999), which allow the court to relieve the Department of its statutory responsibility to provide reunification services when the court is satisfied that the Department has sufficiently demonstrated that an aggravating factor is present, are unconstitutional as applied to her. We find no constitutional infirmity and affirm the judgment.

## I. PROCEDURAL REQUIREMENTS IN CHILD PROTECTIVE CASES

[¶ 2] Because the mother argues that the statutory process has worked to deprive her of her due process rights, we first review the process itself. When the Department has sought and obtained an emergency order of preliminary protection, a summary preliminary hearing must be held within ten days of the filing of the petition, unless the parent consents to the continuation of the order. *See* 22 M.R.S.A. § 4034(4). The parents are entitled to have an attorney represent them at the State's expense if they cannot afford counsel. *See* 22 M.R.S.A. § 4005(2).

[¶ 3] At the summary hearing, the court may limit testimony and "may admit evidence, including reports and records, that would ordinarily be inadmissible as hearsay evidence." 22 M.R.S.A. § 4034(4). This process allows both the petitioner, usually the Department, and the parents or guardian ad litem, to bring evidence to the court's attention in this expedited proceeding that would not otherwise be available. If, after hearing, the court finds by a preponderance of the evidence "that there is an immediate risk of serious harm to the child," 22 M.R.S.A. § 4034(2), it may continue the preliminary protection order and may order that the Department or another person take custody of the child, *see* 22 M.R.S.A. § 4036(1)(F).

[¶ 4] In the ordinary course, as soon as the child has entered foster care as a result of a court order, the Department is required to begin providing rehabilitation services to the parents. *See* 22 M.R.S.A. § 4041(1)(A). If, however, the court has found the presence of an "aggravating factor," *see* 22 M.R.S.A. § 4002(1–B), the court may, but is not required to, relieve the Department of its statutory responsibility to commence or continue rehabilitation services under section 4041. *See* 22 M.R.S.A. § 4034(4). An aggravating factor is defined by statute, and includes circumstances such as sexual assault or chronic abuse of the child by the parent, conviction of the parent for certain violent crimes, a prior involuntary termination of the parent's parental rights to another child, and abandonment of the child. *See* 22 M.R.S.A. § 4002(1–B).[1] In order to assure that there are immediate plans made for the child's future when the Department has been relieved of its responsibility to work with the parents, a permanency planning hearing must be held within thirty days of the entry of the pre-

---

1. The statute provides:

**Aggravating factor.** "Aggravating factor" means any of the following circumstances with regard to the parent.
  A. The parent has subjected the child to aggravated circumstances including, but not limited to, the following:
  (1) Rape, gross sexual misconduct, gross sexual assault, sexual abuse, incest, aggravated assault, kidnapping, promotion of prostitution, abandonment, torture, chronic abuse or any other treatment that is heinous or abhorrent to society; or
  (2) Refusal for 6 months to comply with treatment required in a reunification plan.
  B. The parent has been convicted of any of the following crimes and the victim of the crime was a child for whom the parent was responsible or the victim was a child who was a member of a household lived in or frequented by the parent:
  (1) Murder;
  (2) Felony murder;
  (3) Manslaughter;
  (4) Aiding, conspiring or soliciting murder or manslaughter;
  (5) Felony assault that results in serious bodily injury; or
  (6) Any comparable crime in another jurisdiction.
  C. The parental rights of the parent to a sibling have been terminated involuntarily.
  D. The parent has abandoned the child.
22 M.R.S.A. § 4002(1–B).

liminary order. *See* 22 M.R.S.A. § 4034(4).

[¶ 5] The preliminary protection order is intended to act as a short-term vehicle for providing safety to children in immediate risk of serious harm, not to establish the longer term goals for the parents or children. Thus, any determination of the court in the preliminary order is subject to change as a result of the jeopardy hearing, *see* 22 M.R.S.A. § 4035, and the facts found by the court at the summary hearing are not final for purposes of issue preclusion, *see In re Misty B.*, 2000 ME 67, ¶ 7, 749 A.2d 754, 756. The preliminary order is interlocutory and is not appealable. *See* 22 M.R.S.A. § 4006. It automatically expires upon the issuance of a final protection order pursuant to 22 M.R.S.A. § 4035. *See* 22 M.R.S.A. § 4034(2); *In re Misty B.*, 2000 ME 67, ¶ 7, 749 A.2d at 756.

[¶ 6] The next step in the process requires the court to determine whether the child is in "jeopardy." 22 M.R.S.A. §§ 4002(6), 4035. The jeopardy order must be issued within 120 days of the original filing of the petition unless good cause is shown for the delay. *See* 22 M.R.S.A. § 4035(4–A). Before issuing a final protection order, the court must hold a full adversarial hearing, unless hearing is waived by the parents. *See* 22 M.R.S.A. § 4035(1). Because the summary preliminary hearing and the jeopardy hearing are part of a unified process, the court is permitted to take judicial notice of evidence presented in the summary preliminary hearing. *See In re David W.*, 568 A.2d 513, 515 (Me.1990). It may also take judicial notice of findings made in other jeopardy or termination of parental rights orders. In contrast, the factual findings included in the preliminary protection order are not final, and the parties may present additional evidence on facts relevant to the court's jeopardy and dispositional determinations. *See* 22 M.R.S.A. § 4034(2).[2]

[¶ 7] Unless the parties have reached an agreement at the jeopardy hearing, if the court entered a cease reunification order after the summary hearing and if a parent challenges that order and presents additional evidence regarding the application of an "aggravating factor" to that parent's circumstances, the court must revisit the issues of whether an aggravating factor exists, and if it does, whether a cease reunification provision should be imposed, making use of the evidence presented at both the summary and jeopardy hearings. If, by a preponderance of the evidence, the court finds that "the child is in circumstances of jeopardy to his health or welfare," it may issue a final order of child protection. *See* 22 M.R.S.A. § 4035(2). The court may order one or more of the dispositions in section 4036, including, if an aggravating factor is found, that the Department need not commence or continue reunification. *See* 22 M.R.S.A. § 4036(G–2).

## II. BACKGROUND

[¶ 8] In the matter before us, this process was followed correctly, and the mother does not allege any deviation from the required statutory process by the court. Rather, she argues that the statute, as applied to her, gave rise to a violation of her procedural due process rights. Because she challenges the statute as applied to the individual facts before the court, we review the facts before the court regarding the mother's parenting history.

[¶ 9] Heather C. is the mother's eighth child. The mother is currently thirty-eight years old. Although she had been told for much of her life that she was retarded, she has recently learned that the label may be inaccurate. She is, however, learning disabled, and tests of her intellectual func-

2. At the jeopardy hearing, the court is not required to make a determination that the child is in immediate risk of serious harm.

*See* 22 M.R.S.A. § 4035(2). That factual determination, therefore, is not revisited.

tioning suggests a range of low average to borderline intellectual functioning. She has been diagnosed as suffering from a severe personality disorder which interferes with her ability to understand the needs and actions of her children and to respond appropriately.

[¶ 10] She gave birth to her first child, Lorna, when she was approximately seventeen years old. Lorna's father left her when he discovered that she had become pregnant. Her second child, Crystal, was born when the mother was twenty-one. The mother then met and married a man whom she later described as a chronic alcoholic and who "used [her] as a punching bag." By this father, the mother gave birth to two boys, Albert and Steven.

[¶ 11] The Department first intervened with the mother when Albert and Steven were each twice admitted to the hospital for failure to thrive. When Steven was admitted for the second time, a nurse noted that there was a dead cockroach in the nipple of Steven's bottle, which was coated with curdled milk. The services provided by the Department to the mother were not successful, and eventually, because of continuing allegations of neglect and abuse, including sexual abuse, the Department petitioned for and was granted custody of all four children. A fifth child, Nicole, was born shortly thereafter, and the Department took custody of Nicole before she was discharged from the hospital.

[¶ 12] During the course of those events, the mother received substantial services from the Department, but showed little commitment to or progress in these services. Eventually, the mother voluntarily gave up her parental rights to Nicole in 1990 and to Albert and Steven in 1992. The mother's parental rights to Lorna and Crystal were involuntarily terminated after hearing in 1992.

[¶ 13] The mother eventually divorced her first husband and met the man who would become Heather's father. With him, she gave birth to two sons, Vernal in 1992 and Daniel in 1994. In 1996, the mother petitioned for and obtained an order for protection from abuse against the boys' father, but soon thereafter, with the protection from abuse order still in place, she married her alleged abuser.

[¶ 14] The boys remained in the parents' care until 1997, when the Department was given custody by the court. The boys had been horrifically neglected, and had apparently been deprived of almost all nurturing human contact. They suffered from severe developmental delays. In the child protection order in that case, the court found that the boys "suffered from painful medical and dental neglect and had trouble walking correctly. They had been kept in a cage-like enclosure, euphemistically referred to as a crib, to control them, much like one would cage an animal and they exhibited many feral traits, including being totally uncontrollable." Although the court relieved the Department of any obligation to provide reunification services to the mother, the Department continued to assist her voluntarily until, in January 1999, the mother voluntarily relinquished her parental rights to both boys.

[¶ 15] Heather, the mother's eighth child, was born on March 18, 1999, just two months after her mother voluntarily gave up her parental rights to Vernal and Daniel. The day after Heather was born, the Department petitioned the court for immediate custody. The petition recounted that the State had taken custody of her seven previous children and that, despite the availability and offer of services to the mother, she was unable to care for any of those seven and thus had, either voluntarily or through an adversarial proceeding, lost her parental rights to every one of those children. The petition specifically included reference to the involuntary termination of her rights to Lorna and Crystal in 1992, and included a description of the way she and her husband had treated Daniel and Vernal. The petition also alleged that the mother had not shown any progress with services previously offered

by the Department and that she continued to suffer from a severe personality disorder.[3] On the basis of the prior involuntary terminations and the mother's demonstrated inability to take advantage of services, the Department sought to be relieved of any requirement that it provide reunification services.

[¶ 16] An ex parte order of preliminary protection was issued on the same day, and the Department's request regarding reunification services was addressed after a summary preliminary hearing held six days later. During that hearing, the court asked pointed questions in order to discern the mother's present ability to care for Heather.[4] The guardian ad litem for Heather stated that, in his opinion, Heather's parents would need to be monitored at least "until [Heather was] ten or twelve years old." This kind of intensive monitoring would be required "because of the nature of the parents, their own needs, and it's something that they perhaps cannot do anything about."

[¶ 17] In its order following the summary hearing, the court took judicial notice of the prior court orders and findings regarding the mother. The court also noted, and gave particular weight to, the circumstances under which the mother had very recently voluntarily given up her rights to Vernal and Daniel and the conditions in which the boys had been found. The court ordered that the Department was relieved of any requirement that it provide reunification services to the mother.[5]

[¶ 18] A combined jeopardy and permanency planning hearing was held on June 9

and 10, 1999. At that hearing, the mother presented new evidence regarding her ability to make use of rehabilitation services. She testified that she now maintained a good home. She also presented the testimony of several professionals, including the testimony of her own doctor, a family practitioner, who opined that the mother could parent Heather with sufficient supervision in place. The Department presented a psychologist's evaluation of the mother, which concluded that the mother would be unable to adequately parent Heather "within a reasonable period of time." Evidence showed that the mother continued to suffer from a personality disorder requiring significant therapy.

[¶ 19] Following the hearing, the court issued a final protection order, taking judicial notice of prior evidence submitted at the summary hearing and of previous orders concerning the mother. The court found the mother's experts to be not particularly credible, finding in particular that the mother's doctor had attempted to minimize Vernal's and Daniel's conditions. The court again found that further efforts at rehabilitating the mother would be fruitless, specifically finding that "[r]eunification with [Heather's] parents is too dangerous now and highly unlikely to do anything in the long range other than to expose her to a real threat of severe abuse, neglect, or significant development delays." Accordingly, the court ordered that Heather remain in the Department's custody and that the Department was relieved of any responsibility to provide reu-

---

3. The petition also alleged that the mother's current husband suffered from substance abuse and uncontrollable rages.

4. During discussions with counsel, the court made it clear that the mother's current abilities were foremost in his mind.
   So let's just not pretend that I am approaching this thing without knowing full well what the history is, but that doesn't mean that this child necessarily falls into the same category.... This summary hearing should get to a fair decision as to what's

happened since I last touched this file and these people actually in January.

5. The court declined to make a similar order with respect to the father. The Department had based its petition in this regard on the father's "heinous or abhorrent" treatment of the older children. The court held that the statute, however, requires that such heinous and abhorrent treatment be of the child at issue, not another child. *See* 22 M.R.S.A. § 4002(1–B)(A)(1).

nification services to either parent. The mother then filed this appeal.[6]

## III. DISCUSSION

[¶ 20] The mother presents a challenge to the constitutionality of section 4002(1–B) as it has been applied in this case. Specifically, the mother alleges a procedural due process violation, arguing that the process creates a high risk of erroneous deprivation of a parent's fundamental rights to raise her children, which outweighs the State's interests in carrying out an expeditious child protection proceeding.[7]

■ [¶ 21] The Due Process Clause of Fourteenth Amendment, and article I, section 6–A of the Maine Constitution, place certain constraints upon the exercise of governmental power that serves to deprive an individual of a life, liberty, or property interest. U.S. CONST. amend. XIV; ME. CONST. art. I, § 6–A; *see also Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *In re Christmas C.*, 1998 ME 258, ¶ 9, 721 A.2d 629, 631 (quoting *State v. Rosado*, 669 A.2d 180, 182 (Me.1996) (reiterating principle that the Maine Constitution and the Constitution of the United States are declarative of identical concepts of due process)).

■ [¶ 22] When a protected right is implicated, the question of what process is due depends on the nature of the interest and the risks to that interest. *See In re Christmas C.*, 1998 ME 258, ¶ 11, 721 A.2d at 632. In answering this question, we balance the three factors articulated by the Supreme Court in *Mathews*. *See In re Kafia M.*, 1999 ME 195, ¶ 21, 742 A.2d 919, 926 (citing *Mathews*, 424 U.S. at 334–35, 96 S.Ct. 893).

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. 893 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263–71, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)), *cited in In re Kafia*, 1999 ME 195, ¶¶ 21–22, 742 A.2d at 926–27.

■ [¶ 23] As to the first factor, there can be no dispute that there exists within the constitutional frameworks of the federal and state constitutions a fundamental and important right to raise one's children. *See In re Christmas C.*, 1998 ME 258, ¶¶ 10–11, 721 A.2d at 631–32; *In re Alex-*

---

**6.** Once a final protection order is issued in a child protection case, any preliminary order becomes moot. *See In re Misty B.*, 2000 ME 67, ¶ 7, 749 A.2d 754, 756. We also hold today, in a similar but unrelated case, that orders following a preliminary hearing are interlocutory, and that the statutory prohibition of appeals from such orders does not violate due process. *See In re Kristy Y.*, 2000 ME 98, ¶ 5, 752 A.2d 166, 168. Accordingly, we treat this appeal as being solely from the final jeopardy order.

**7.** Recognizing the difficulties inherent in mounting a purely facial due process challenge, the mother has abandoned her original facial challenge and now argues only that the statute violates her due process rights as ap-

plied. *See, e.g., United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (holding that, in a facial challenge, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid"). *But see Planned Parenthood of Southeastern Penn. v. Casey*, 505 U.S. 833, 898, 112 S.Ct. 2791, 120 L.Ed.2d 674 (applying an "undue burden" test in the context of a reproductive rights challenge). *See also Dombrowski v. Pfister*, 380 U.S. 479, 494, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (applying "overbreadth" test in the context of First Amendment challenges). For a discussion of the debate on application of appropriate tests in facial challenges, see *Planned Parenthood of the Blue Ridge v. Camblos*, 155 F.3d 352, 359 n. 1 (4th Cir.1998).

*ander D.*, 1998 ME 207, ¶ 14, 716 A.2d 222, 226–27. We have held that there also exists a fundamental and important right to receive reunification services at state expense, although that interest is somewhat less important than that implicated in a termination proceeding. *See In re Christmas C.*, 1998 ME 258, ¶ 11, 721 A.2d at 632.

[¶ 24] Accordingly, the remaining factors require an evaluation of the potential for an erroneous deprivation of those rights against the government's interest in maintaining the procedure embodied in the statute. The mother contends that the process chosen by the Legislature creates a high risk of an erroneous deprivation of her rights. Because the statute does not explicitly require that the court evaluate whether the prior terminations has any relevance in her present case, the mother contends, the court is able to relieve the Department of its duty to provide reunification services to her when she may, in fact, be perfectly capable of receiving them.[8]

■■■ [¶ 25] We are not persuaded that the statute poses a high risk for erroneous deprivation of a parent's rights. The statute is written to *allow*, but does not mandate, that the Department be relieved of its responsibilities. Where the court is accorded discretion by the Legislature, it must exercise that discretion in a reasonable manner. *See West Point–Pepperell,*

*Inc. v. State Tax Assessor*, 1997 ME 58, ¶ 7, 691 A.2d 1211, 1213 (quoting *Coon v.. Grenier*, 867 F.2d 73, 78 (1st Cir.1989)) (citations omitted). In order to exercise its discretion in circumstances where the competing interests of the parent in raising her child and the State in protecting the child from harm are at stake, the court considers both the historical and present circumstances of the family. Thus, the court may not consider the aggravating factor in the abstract as the mother fears. Rather, it must take into account the nature of the aggravating factor and any relevant facts related to a parent's and child's current circumstances. By its language, the statute requires the court to act on the facts unique to each family's circumstances.

■■■ [¶ 26] In addition, there are procedural safeguards in place designed to protect against and correct potential error. Application of the aggravating factor is discretionary, and is reviewable in this Court for an abuse of discretion.[9] Thus, a parent is not without recourse in the event that the court abuses its discretion and relieves the Department of its reunification responsibilities without justification. Accordingly, we conclude that the risk of erroneous deprivation of a parent's rights in the process established by the Legislature is minimal.

[¶ 27] We look next to the State's interest underlying the chosen procedure. In

---

8. The mother's argument that the statute punishes a parent for exercising her right to contest a termination is unpersuasive. First, a contested termination hearing results in a finding that termination is appropriate in a case that is actually litigated, which may reasonably be accorded more weight than a termination without such findings. Second, a voluntary termination may occur in the absence of any jeopardy to the child or actual parental inability, as may be the case when an infant is placed for adoption, and thus a voluntary termination arguably may be less reliable as an "aggravating factor" than an involuntary termination. Moreover, an involuntary termination is more likely to occur only after substantial efforts have been made to assist the parent to rehabilitate and im-

prove parenting abilities. Thus, the statute is not a "punishment," as the mother labels it, because there is, in fact, a distinction between the two classes of termination that is pertinent to the court's decision regarding additional efforts at reunification.

9. We defer to the trial court's ability to give weight to the appropriate factors when it has correctly understood the facts and circumstances material to the decision at hand, and will find abuse only where the court makes a "serious mistake" in weighing those factors. *See West Point–Pepperell, Inc. v. State Tax Assessor*, 1997 ME 58, ¶ 7, 691 A.2d 1211, 1213 (quoting *Coon v. Grenier*, 867 F.2d 73, 78 (1st Cir.1989)).

enacting the legislation that allows the court to relieve the Department of its responsibilities under section 4041, the Legislature made it clear that it sought to facilitate "expeditious action in child protection cases." L.D. 2246, Summary (118th Legis.1998). The State's interest in protecting children is substantial and important. *See In re Alexander D.,* 1998 ME 207, ¶¶ 14–15, 716 A.2d at 227. More specifically, the statutory goal of the "early establishment of permanency plans for the care and custody of children," 22 M.R.S.A. § 4003(4), is significant, *see In re Randy Scott B.,* 511 A.2d 450, 453 (Me.1986).

[¶ 28] The process established by the Legislature addresses not only the need for expeditious action when a child's health and safety are at issue, but also addresses other significant State interests. First, when a parent has acted toward another child, or the child in the proceeding before the court, in a way that resulted in a child's death or serious bodily injury, *see* 22 M.R.S.A. § 4002(1–B)(B), the State has a legitimate interest in assuring that the child now before the court is not placed in similar circumstances through a misguided effort at reunification. Similarly, if a parent has subjected the child before the court to the kinds of serious harm enumerated in 22 M.R.S.A. § 4002(1–B)(A) (including, e.g., rape, gross sexual assault, torture, etc.), the State has a legitimate interest in assuring that the child is not unnecessarily subjected to a risk of recurrence. In such cases, where an aggravating factor is found to exist, the State's interest in protecting the child from such risk is substantial.[10]

[¶ 29] The State also has a legitimate interest in making the best use of its limited resources. There is no dispute from parents or agency representatives that the Department's resources are limited and in many instances are insufficient even to meet the needs of parents who are able and willing to work on the impediments to the return of their children. When a parent has previously been determined, after notice and opportunity to be heard, to be unable to care for a child, such that the parent's rights must be terminated, that parent may not be a good candidate for further expenditures of limited child protective resources in order to pursue rehabilitation again.[11] If difficult decisions regarding allocation of scarce resources must be made, the Legislature's determination that a prior involuntary termination is a factor to be considered is both reasonable and legitimate.

[¶ 30] The court in this case considered the Department's previous extensive provision of resources in its effort to reunify the mother with her other children. It also considered the severity of the harm suffered by those children, noting the devastating lack of success of her recent efforts at parenting. The court appropriately placed considerable weight on the circumstances in which her two sons, Daniel and Vernal, had recently been found. More importantly, the court directly addressed the mother's current capacity as a parent in its final protection order:

> The reliable evidence is virtually undisputed that it would [be] dangerous to place this child in the [parents'] home without some very intrusive and extensive supervision. Even if such extensive service was available, the likelihood of one or both of these parents becoming able to prevent this child from suffering the same fate of their two sons and [the mother's] five other children is extremely remote. These parents suffer from deeply rooted debilitating personality/psychological conditions which will re-

---

**10.** As always, the court retains the discretion to require reunification efforts in circumstances where the effort can be made safely and expeditiously.

**11.** A parent who seeks services to reunify with his or her child, notwithstanding the court's order relieving the Department of its responsibility to help that parent, may still have access to services funded through medicaid (or medicare) and other public programs.

quire extensive and long term therapy, assuming a recognition and good faith commitment. This child should not be subjected to the strong likelihood of neglect or abuse simply in the name of ignoring the past and letting parents who have been shown recently to lack the ability to adequately parent children start with a clean slate with each birth.

[¶ 31] It is evident that the court did not rely merely on the prior involuntary terminations and that it considered all relevant factors and exercised its discretion in finding that further attempts at reunification were not warranted. Moreover, the court's careful consideration of the mother's current abilities, even in the face of the extreme neglect to which she had recently subjected her sons, Daniel and Vernal, belies the mother's claim that the court erroneously relied entirely or too heavily on the earlier involuntary termination. We find no constitutional infirmity in the process or the application of the statute in these circumstances.

[¶ 32] In sum, we conclude that the procedures followed by the court, including the finding of an aggravating factor under section 4002, and the order relieving the Department of the need to provide reunification services, "were well-tailored to protect the [mother's] constitutional rights, while at the same time to protect the State of Maine's interest in determining the child's status without undue delay." *In re Randy Scott B.*, 511 A.2d at 453. The court did not abuse its discretion nor violate any constitutional right of the mother in determining that the Department should be relieved of any further responsibility to assist the mother in rehabilitating and reunifying with Heather.

The entry is:

Judgment affirmed.