IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GIANNA SIERRA[1] and GILBERTO RODRIGUEZ, | § § § | Nos. 354, 2019C |
| | § | 355, 2019C |
| Respondents Below, Appellants, | § § | |
| | § | Court Below: Family Court |
| v. | § | of the State of Delaware |
| | § | |
| DEPARTMENT OF SERVICES | § | File Nos. 17-09-06TN |
| FOR CHILDREN, YOUTH AND | § | CN15-02247 |
| THEIR FAMILIES, | § | |
| | § | Pet. Nos. 17-28587 |
| Petitioner Below, | § | 16-29934 |
| Appellee. | § | |
| | § | |
| IN THE INTERST OF: | § | |
| Giselle Rodriguez-Sierra. | § | |

Submitted: June 17, 2020
Decided: August 17, 2020

Before **SEITZ**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

Upon appeal from the Family Court. **AFFIRMED**.

Brian T.N. Jordan, Esquire, Jordan Law, LLC, Wilmington, Delaware; *Attorney for Respondent Below, Appellant Gianna Sierra.*

George R. Tsakataras, Esquire, The Law Office of George R. Tsakataras, P.A., Wilmington, Delaware; *Attorney for Respondent Below, Appellant Gilberto Rodriguez.*

Eliza M. Hirst, Esquire, Office of the Child Advocate, Wilmington, Delaware; *Attorney for Child, Giselle Rodriguez-Sierra*.

---

[1] The Court previously assigned pseudonyms to the parties under Supreme Court Rule 7(d).

Janice Rowe Tigani, Esquire, DEPARTMENT OF JUSTICE, Wilmington, Delaware; *Attorney for Department for Children, Youth and their Families*.

**SEITZ**, Chief Justice:

Mother and Father appeal from a Family Court order terminating their parental rights in Giselle, who was four months old when the Family Court first ordered her removed from the parents' care. The court found Giselle was at risk of chronic and life threatening abuse based on the previous unexplained serious injuries to her older sibling. The Family Court also found Mother and Father failed to plan for Giselle's physical needs and her mental and emotional health and development. Mother and Father challenge the sufficiency of the evidence supporting the termination of parental rights and raise a number of constitutional arguments on appeal. We find the arguments lack merit and affirm the Family Court's judgment.

I.

Gianna Sierra and Gilberto Rodriguez are Spanish-speaking parents of three children relevant to this proceeding.[2] Prior to this action, the Department of Services for Children, Youth and their Families brought a dependency/neglect petition against the parents for serious physical injuries suffered by one of their children.[3] In

---

[2] Unless stated otherwise, we take the facts from the Family Court's decision to terminate parental rights. *Dep't of Servs. for Children, Youth and Their Families v. G.S.*, 2019 WL 3230912 (Del. Fam. July 10, 2019) (hereinafter "Opinion").

[3] The Division of Family Services is a division within the Department of Services for Children, Youth and their Families.

December 2015, after the child was hospitalized, the Family Court found that "[c]lear and convincing evidence exists to believe that [a child] . . . has been abused" by both parents.[4] The court continued that both parents "have collectively subjected [that child] to chronic abuse" and their "life-threatening abuse . . . caused [that child] to develop severe life-threatening head trauma."[5] The court found the parents' explanations for what caused the injuries inconsistent with the medical findings. After the parents voluntarily relinquished their parental rights in both children, the court terminated their parental rights on December 29, 2016.[6]

While the termination of parental rights proceeding was ongoing, Mother and Father had another child, Giselle. The parents took Giselle to the hospital several times over the following months, generally for routine visits. On August 30, 2016, Giselle came to the hospital "clenching her hands really tight" for unknown reasons.[7] The hospital did not find signs of abuse. Shortly after, DSCYF sought emergency custody claiming that Giselle was "at risk of serious injury based on the family's substantiated DFS history."[8] The court agreed that there was probable cause of a substantial, imminent risk of danger to Giselle based on the previous serious injuries

---

[4] *Id.* at *2 (quoting Adjudicatory Hearing Order).
[5] *Id.* According to the court, injuries were serious from the time in Father's care—a left tibia fracture, left acute subdural hematoma, and bilateral retinal hemorrhaging—and Mother's care—additional acute subdural hematoma and bilateral retinal hemorrhaging.
[6] Mother also consented to the termination of her parental rights in the children's half-brother.
[7] *Id*. at *3.
[8] *Id.*

to her sibling. The court granted custody to DSCYF, who placed four-month-old Giselle with an English-speaking foster family.

In a series of hearings between December 2016 and December 2018 the court assessed whether Giselle was "derivatively dependent" based on the court's previous finding that the parents had physically abused her older sibling. The court evaluated the derivative dependency issue by looking at three factors—whether the "prior finding demonstrate[d] such an impaired level of parental judgment as to create a substantial risk of harm for any child in that parents care;" whether the prior finding was proximate in time to the derivative proceedings; and whether the court could "reasonably conclude in the aggregate that the conditions resulting in the prior finding likely continue to exist."[9]

The court found that all three factors favored finding the child derivatively dependent. According to the court, her older sibling's injuries were severe, they were proximate to when Giselle was last in the parents' care, and they likely continued to exist.[10] While DSCYF generally has a duty to pursue reasonable efforts to reunify the family, the court excused DSCYF from such efforts in light of the derivative dependency finding.[11] But because the court also found that the parents

---

[9] *Id.* (quoting *In re Hunter YY.*, 795 N.Y.S.2d 116, 118 (N.Y. App. Div. 2005)).

[10] Father's Opening Br. Ex. C at 4.

[11] *Id.* at 2 (excusing reasonable efforts because of "the Court's findings that the 'derivative risk' to the Child based on the chronic, life-threatening injuries suffered by [the] sibling had not been remedied by the parents," and noting that "the injuries occurred in proximate time to DSCYF/DFS

4

"should not necessarily be barred from exercising their parental rights for an indefinite period of time," it ordered concurrent goals of reunification and TPR/adoption.[12]  As the court found, the parents "have a right to have available to them the opportunity to demonstrate that the Child will no longer be dependent in their care."[13]  The court also increased visitation opportunities.[14]

At one of the later hearings, the court also found the parents took steps that "according to DSCYF/DFS would have been elements of a case plan if it were required to offer Parents a case plan."[15]  The court noted that "[i]f, according to [DSCYF], it was known which parent was responsible for the sibling's injuries and the parents no longer resided together, DSCYF/DFS would be willing to plan for reunification with the non-culpable parent, assuming one parent was innocent."[16]

---

seeking custody of the Child and that Mother and Father have never provided a reasonable explanation for the sibling's severe injuries").

[12] *Id.* at 4.  It is unclear how these were concurrent when the court excused DSCYF from pursuing reasonable efforts of reunification.  *See In re Burns*, 519 A.2d 638, 649 (Del. 1986) (finding that "[t]o require continued reunification efforts, while contending for termination, is illogical" because when the State pursues termination, it "assumes an adversarial role vis a vis the parents").

[13] Father's Opening Br. Ex. C at 4–5.

[14] *Id.* at 5; Father's Opening Br. Ex. B at 3 ("Parents should be allowed, where and when appropriate to demonstrate not only that they pose no unreasonable risk to Child, but also that there is a developing parent-child bond.  To this end, it is appropriate that DSCYF/DFS consider increasing visitation.").

[15] Father's Opening Br. Ex. B at 2.  Parents completed an approved parenting class, were cooperative, and had sufficient income and stable housing.  Mother engaged in a domestic violence class, mental health treatment, and its recommendations.  Father completed an anger management class.

[16] *Id.*

When DSCYF eventually sought to terminate parental rights, it did so on three grounds—chronic and life-threatening abuse, unexplained serious injury, and failure to plan.[17] The chronic and life-threatening abuse grounds are met when "[t]he parent has subjected a child to torture, chronic abuse, sexual abuse, and/or life-threatening abuse."[18] Because the statute was amended in 2009 to refer to "*a* child" instead of "*the* child," the court reasoned it could consider whether Giselle was derivatively dependent based on the court's previous finding that the parents abused the older sibling.[19]

First, the court found the parents' poor judgment created substantial risk of harm for any child because the older sibling suffered head injuries under the exclusive care of each parent, two weeks apart, as an 11-month-old child. Second, the court's abuse finding was proximate to the emergency custody order because of the severity of the sibling's head injuries, and the "fact that the parents never provided a reasonable explanation for those injuries."[20] And third, because the parents never provided a reasonable explanation for the sibling's injuries and they remained living together and in a relationship, the court found it "very difficult to

---

[17] 13 *Del. C.* §§ 1103(a)(7), 1103(a)(8), 1103(a)(5).

[18] 13 *Del. C.* § 1103(a)(7).

[19] Opinion at *5 (emphasis added).

[20] *Id.* at *7. The court considered the time between the court's abuse findings in December 2015 and the emergency custody order in September 2016. And even if measured from the time of the sibling's injuries in March 2015 to September 2016, the court found it was still proximate.

identify and plan out the optimal remedy."[21] The court also found that the parents did not learn how to protect young children from unsafe environments, the parents "have too many weaknesses in their parenting . . . to feel comfortable recommending that Child be returned to their care," and the parents did not have the parenting skills to provide a consistent and predictable environment.[22] Thus, the court found this ground supported terminating parental rights. It adopted the same analysis and conclusion for the unexplained serious injury ground of the statute.[23]

As a statutory matter, its abuse finding was sufficient to support termination of parental rights without exploring whether the parents had made reasonable efforts to plan for Giselle's needs. Even so, the court considered the parents' ability to plan. The court found that, despite the active steps towards a hypothetical case plan, there was "no testimony . . . from any professionals involved in the case that the parents are ready to have Child returned to their care."[24] Even the parents' expert thought the best option was for the foster parents to be permanent guardians and the parents maintain a legal connection to the child. The court found that making the foster

---

[21] *Id.* at \*8 (The court found it "important to note, although not dispositive alone, that the parents continue to fail to provide a reasonable explanation" for the sibling's injuries, if only because an expert was more concerned about providing medical oversight in a case of unexplained injury than explained injury.) (footnote omitted).
[22] *Id.*
[23] *See* 13 *Del. C.* § 1103(a)(8) ("A child has suffered unexplained serious physical injury, near death or death under such circumstances as would indicate that such injuries, near death or death resulted from the intentional or reckless conduct or wilful neglect of the parent.").
[24] *Id.* at \*10.

7

parents permanent guardians was not possible until the child was twelve years old. The court rejected postponing the decision for another nine years because Giselle was "entitled to permanency."[25] The court added that the parents were still together, not living with someone who could help protect Giselle, and had not sought services to address the past injuries to the older sibling. And finally, the court noted Giselle was in DSCYF custody for almost thirty months by the last hearing and deserved permanency. The court concluded that the parents failed to plan.

After finding grounds for termination, the court considered whether termination was in the child's best interests under the factors in 13 *Del. C.* § 722. The court found several factors weighed against termination[26] or were neutral,[27] but gave the most weight to the factors favoring termination. Most relevant here, for the factor considering the interactions between the parents and Giselle, the court concluded that the parents' parenting skills had significant deficits and additional interactions might increase stress to Giselle and increase the risk of harm. Also, the court found, Giselle had a strong and positive relationship with her foster parents, and no expert testified that Giselle should be returned to the parents' primary care.

---

[25] *Id.*

[26] The court found the parents desire to have the child back and the lack of criminal histories supported denying the petition. And the parents generally complied with their rights and responsibilities to the child, although it "only slightly" favored denying the petition because of the prior terminations of parental rights and the inability to improve parenting skills. *Id.* at *18.

[27] The wishes of the child did not apply due to the child's young age, and the mental and physical health of all individuals involved was neutral because there were counterbalancing considerations.

Finally, the court found it could consider the older sibling's previous injuries as evidence of domestic violence. Based on the strength of those three factors, the court found termination in Giselle's best interests and terminated Mother's and Father's parental rights.

We consolidated the parents' appeals. On appeal we review the Family Court's decision for an abuse of discretion when the judge properly applied the law, and review issues of law *de novo*.[28] "We will not disturb findings of fact unless they are clearly wrong and justice requires their overturn."[29] And "this Court will not substitute its own opinion for the inferences and deductions made by the Trial Judge where those inferences are supported by the record and are the product of an orderly and logical deductive process."[30] We address the parents' statutory arguments first, and then review the parents' constitutional arguments.

## II.

The Family Court must follow two steps before terminating parental rights.[31] First, there must be at least one of the statutory grounds for termination under 13 *Del. C.* § 1103.[32] If the court finds grounds for termination, the court must then

---

[28] *Powell v. Dep't. of Servs. for Children, Youth and their Families*, 963 A.2d 724, 730–31 (Del. 2008).
[29] *Solis v. Tea*, 468 A.2d 1276, 1279 (Del. 1983).
[30] *Id.*
[31] *Shepherd v. Clemens*, 752 A.2d 533, 536–37 (Del. 2000).
[32] *Id.* at 537.

9

determine whether severing parental rights is in the best interests of the child under the factors in 13 *Del. C.* § 772.[33]  The petitioner, DSCYF in this case, must prove the elements of each step by clear and convincing evidence.[34]

The Family Court relied on "derivative dependence" to find two statutory grounds had been met—§ 1103(a)(7) (the parents have "subjected a child to torture, chronic abuse, sexual abuse, and/or life-threatening abuse") and § 1103(a)(8) ("[a] child has suffered unexplained serious physical injury, near death, or death under such circumstances as would indicate that such injuries, near death or death resulted from the intentional or reckless conduct or wilful neglect of the parent").  The court reviewed three factors relevant to derivative dependence—whether the "prior finding demonstrate[d] such an impaired level of parental judgment as to create a substantial risk of harm for any child in that parents care;" whether the prior finding was proximate in time to the derivative proceedings; and whether the court could "reasonably conclude in the aggregate that the conditions resulting in the prior finding likely continue to exist."[35]

The parents do not challenge the court's use of a three-part test to assess derivative dependency, or that one of the factors weighed against them—impaired parental judgment due to the severity of the sibling's injuries incurred under the

---

[33] *Id.*
[34] *Id.* at 537, 542.
[35] Opinion at *3 (quoting *In re Hunter YY.*, 795 N.Y.S.2d at 900).

exclusive care of each parent. Instead, they challenge the other two factors—proximity and whether the conditions are likely to continue to exist. For the proximity element, the court chose December 2015 as the start date, when the court first found abuse, and September 2016, when the parents last had unsupervised time with the child. Based on that duration, the court found the prior abuse proximate. The court also considered and rejected Father's arguments that the initial point should be when the injury occurred and the later point should be the present date, which at the time was over four years apart. And even if, according to the court, it considered the duration from the time of injury, March 2015, to September 2016, it was still proximate.

Father argues that the duration under consideration should have been the more than five years between the sibling's injuries and now, and that such time is not proximate. As evidence of their parental abilities, he adds that the parents completed services consistent with a case plan and the child was "*actually* safe and well cared for with" the parents for the first four months.[36]

---

[36] *See* Father's Opening Br. at 39.

11

There are few reported cases on the proximity issue,[37] and fewer in Delaware.[38] The proximity element helps the court assess the ongoing risk of returning the child to the home. Setting the initial date at the time of injury is more consistent with this purpose because it better identifies a time of risk to the child than a court-planned hearing date. And setting the later date to the date of reunification is similarly more useful for assessing the risk to the child if returned home. While using those dates creates a longer duration than the Family Court considered in this case, it is not reversible error unless it caused the court's ultimate conclusion to be outside the factual record developed during the hearing. As noted earlier, the older sibling's injuries were severe, the parents voluntarily relinquished their parental rights in other children, and the court found that the parents lacked basic parenting skills to protect Giselle from future harm. Thus, even with the longer

---

[37] *Compare In re Dana T*., 896 N.Y.S.2d 545, 546 (N.Y. App. Div. 2010) (finding that a previous adjudication of neglect, which was five years earlier, was too remote under the circumstances to find derivative neglect because the petitioner failed to show that those conditions leading to the adjudication still existed), *and In re Monica C.M*., 968 N.Y.S.2d 143, 145 (N.Y. App. Div. 2013) (finding that the prior abuse, which occurred four years before the relevant child's birth, was insufficient to prove derivative neglect because, in part, it was too remote), *with In re Hunter YY*, 795 N.Y.S.2d at 116 (finding that two to three years was sufficiently proximate to find derivative neglect), *and Mario G. v. Arizona Dep't of Econ. Sec*., 257 P.3d 1162, 1167 (Ariz. Ct. App. 2011) (considering the duration between the incidents and proceedings, three years, and between the prior adjudication and proceedings, nine months, were not too remote), *abrogated on other grounds by Sandra R. v. Dep't of Child Safety*, 459 P.3d 486 (Ariz. 2020).

[38] *See Div. of Family Servs. v. J.W.*, 2013 WL 7761082, *9–10 (Del. Fam. Oct. 30, 2013) (granting custody of a child to DFS after finding the child "would be neglected if placed in his father's care" in part because another child was injured severely in the father's care over three years earlier).

duration, the Family Court would not have abused its discretion when it found the harm to Giselle's older sibling proximate for purposes of derivative dependency.

The court also found that, in the aggregate, the conditions causing the prior finding "likely continue to exist."[39] Because the parents did not offer any explanation for the injuries to the older sibling, the court could not determine whether the cause persisted. Further, the court found "no evidence" the parents "have focused any services on learning how to protect young children from unsafe environments," and noted the State's expert testified that the parents "have too many weaknesses in their parenting for her to feel comfortable recommending that Child be returned to their care."[40] Although the court recognized that the parents completed activities typical of a case plan, they did not overcome its finding that the cause of the prior injuries likely continued to persist. The record supports the court's conclusion that the conditions resulting in the sibling's injury "likely continue to exist."[41]

---

[39] Opinion at *8.

[40] *Id.*

[41] Father also argues that the court erred when it found permanent guardianship was a legal impossibility and not in the child's best interests. According to Father, permanent guardianship could have been ordered if the foster parents first became guardians for a certain time. But becoming guardians requires a court petition, which Father concedes did not occur. *See* 13 *Del. C.* § 2320 ("[A]ny adult person or persons may petition the Family Court for a guardianship order regarding a child not his, hers or theirs."); Father's Reply Br. at 14 ("[N]o Guardianship or Permanent Guardianship petition was pending before the [Family] Court at the time [termination of parental rights] was granted."). We cannot fault the court for failing to consider an alternative that neither party sought formally. We also find without merit Father's argument that termination of parental rights was contrary to fundamental fairness and public policy. DSCYF had serious and

III.

The parents raise several constitutional issues on appeal. They argue that DSCYF should have searched for a Spanish-speaking foster home and should not have relied on the language barrier to support termination.[42] Father also argues that the statute relied on by the court to excuse DSCYF from pursuing reasonable reunification efforts under certain circumstances before terminating parental rights is unconstitutional. And, Father argues, the court improperly infringed on the parents' Fifth Amendment rights when it relied on the older sibling's unexplained injuries to terminate their parental rights.

Parents must be accorded due process before terminating parental rights.[43] To decide what process is due, this Court weighs the three factors from the United States Supreme Court's decision *Mathews v. Eldridge.*[44] The first factor considers the private interests affected by the official action.[45] No one disputes the significance of the private interest affected here—the right to parent.[46] The second factor is the

---

justifiable concerns about the safety of the newborn after previous experience with the parents. Although trying to preserve the family unit is a high priority of DSCYF and the court, the State has recognized that some circumstances present too great a risk to the health and safety of children to keep a family intact.

[42] This is Mother's only argument. Father incorporates it and adds the remaining challenges.
[43] *Orville v. Div. of Family Servs.*, 759 A.2d 595, 598 (Del. 2000).
[44] 424 U.S. 319 (1976); *Orville*, 759 A.2d at 598; *see also Burns*, 519 A.2d at 645–46 (finding these due process principles "stand on independent judicial and statutory bases, clearly enunciated by this Court and the General Assembly as mandated by the due process standards of the Delaware Constitution").
[45] *Orville*, 759 A.2d at 598.
[46] *Burns*, 519 A.2d at 645 ("The parental right is a sacred one.").

14

risk of "erroneous deprivation of the interest through the procedures used and the probable value of any additional or substitute procedural safeguards."[47]  And the final factor is the government's interests at stake.[48]  As this Court has stated, the government's interests are also important, including protecting the welfare of minor children, fostering an accurate decision, and economic efficiency.[49]  In cases like this—when both the private and governmental interests at stake are significant—the second factor is "pivotal."[50]

## A.

First, we address whether DSCYF should have searched for a Spanish-speaking foster family before placing her in an English-speaking home.  We note that the claim is not that Giselle had to be placed in a Spanish-speaking home.  Instead, the parents' claim that DSCYF must see if one was available.  According to the parents, DSCYF knew the parents did not speak English, the foster home's language would become the child's language because of the child's age, and DSCYF did not look for a Spanish-speaking placement.[51]  As a result, the parents argue, the

---

[47] *Id.*
[48] *Id.*
[49] *Watson v. Div. of Family Servs.*, 813 A.2d 1101, 1110 (Del. 2002) (noting that economic interests alone are "not enough to override the great compelling interests of the parents that are at stake").
[50] *Waters v. Div. of Family Servs.*, 903 A.2d 720, 726 (Del. 2006).
[51] Mother also argues that the violation "was aggravated when DFS did not provide Child with any Spanish language instruction or tutor."  Mother's Opening Br. at 20.

15

English-speaking placement created "an insurmountable language barrier between the pair."[52] And, they argue, the court relied on an expert that "blamed Mother's parenting rather than the apparent language barrier" to find that Mother and child "are not attuned to one another" and, ultimately, to terminate their parental rights.[53]

Our review of the record, however, does not support a due process violation. Although language should be considered in placements, the court did not violate the parents' due process rights because whatever language barrier existed did not lead to the court's decision to terminate parental rights. First, once the Family Court decided that the statutory grounds for termination had been met through its derivative dependency determination, DSCYF was excused from making reasonable efforts to unify the family, including efforts to prevent a language barrier. Further, when considering witness testimony to assess the best interests of the child, neither the witnesses nor the court relied on any language barrier to evaluate the parents' fitness as parents.

Testifying for DSCYF, Ms. Magana Luna, a bilingual family interventionist, observed bi-weekly visitations beginning in June 2017, felt that the visits were "strong/adequate," and did not express a concern about a language barrier.[54] Ms.

---

[52] *Id.* at 19.

[53] *Id.* at 12, 21. DSCYF argues, in part, that the parents did not ask to move Giselle to a Spanish-speaking home.

[54] Opinion at *12; App. to Mother's Opening Br. at A0149 (agreeing that generally, the "twice a week visitation went well" and "[t]here was good interaction between parents, primarily Mother").

16

Randall, a licensed clinical social worker, testified to "a largely negative assessment of the parent-child relationship" after observing two supervised visits.[55] After administering two assessments that test "caregivers in four domains (structure, engagement, challenge and nurture) over ten different age-appropriate activities,"[56] Ms. Randall concluded that the parents "exhibit[ed] 'obvious deficient parenting' which can lead to abuse and/or neglect of a child," and the child was not attached to the parents "at least in part due to their 'inability to parent.'"[57] As for a language barrier, Ms. Randall was unconcerned, with only minor notes about the parents' inability to understand Giselle's English and Mother's decision to teach Spanish when she should have been focused on another activity.[58]

The parents' expert, Dr. Romirowsky, criticized "Ms. Randall's use of the [assessment] to make authoritative conclusions about" the parents' capacity to parent

---

[55] Opinion at *13.

[56] Id. The test is known as the Marschak Interaction Method ("MIM").

[57] Id. at *14. Ms. Randall also cited the foster parents' strong parenting skills. Ms. Randall recommended terminating parental rights but maintaining a relationship between the child and birth parents to "minimize the negative impact of the primal wound and to allow for some cultural amelioration." Id.

[58] App. to Mother's Opening Br. at A0431 (Ms. Randall testified that she did "not [have any concern about the language barrier], as far as [the child] understanding the parents' directions. Um – my concern is that the parents do not understand her English, and so – especially Birth Mother. So that, I think, is a problem. Um – but [the child] clearly understood – um, and actually – um, engaged and would speak in Spanish, with Birth Mother, and appeared to enjoy it."); id. at A0612–13 ("It's a negative if the parent turns nurturing activities, such as applying lotion, into a teaching activity, because what that does is – is, it takes – that puts a – an obstacle. It can cause the child frustration. . . . What birth mother was doing is, she was applying the lotion, which, in and of the [sic] itself, [Giselle] very much enjoyed. However, she then turned it into teaching the child the Spanish language.").

17

because it "should be used for parental guidance and treatment planning."[59]  And he testified it was "crucial" that children maintain contact with biological parents and recommended keeping a legal relationship between the child and parents.[60]  He did not, however, focus on a language barrier.  Finally, Mother testified that Giselle could understand some of her Spanish during the assessments, but not all of it.[61]

The testimony shows that none of the witnesses relied on a language barrier to support their observations and opinions, even though the parents had the opportunity to challenge the basis of those opinions during the hearings.  The court also did not rely on a language barrier to conclude that the parents lack the necessary parenting skills.  Thus, there was not such a risk of erroneous deprivation of parental rights to find a due process violation.

## B.

Father also argues that the statute excusing the State from pursuing reasonable efforts to reunify the family is unconstitutional on its face and as applied because it is not the least restrictive means available to the State for terminating parental rights.

---

[59] Opinion at *15.  Dr. Romirowsky never met the parents or child.
[60] *Id.*
[61] App. to Mother's Opening Br. at A0750 (indicating she thought Giselle could understand Spanish words, but not phrases); *id.* at A0773 (stating she had not "seen [Giselle] getting frustrated" because of trouble understanding Spanish, but did "notice that [Giselle] doesn't pay attention to" her).

18

Because parenting is a fundamental right, Father argues, the State must allow for some sort of case planning before terminating parental rights.

Section 1103(d) of Title 13 provides that DSCYF "is not required to perform, but is not prohibited from performing, reunification and related services" when DSCYF seeks termination on certain grounds.[62] Those grounds, described as "aggravating factors," include abandonment, prior felony conviction, involuntary termination of parental rights over a sibling, chronic abuse or life-threatening abuse, or unexplained serious physical injury.[63]

We presume statutes are constitutional unless there is clear and convincing evidence of unconstitutionality.[64] The Supreme Court of the United States has described parental rights as fundamental, but has generally avoided deciding on a particular standard of review for all cases addressing parental rights.[65] When

---

[62] The federal Adoption and Safe Families Act provides that states may bypass reasonable efforts of reunification under certain circumstances. 42 U.S.C. § 671 (a)(15)(D) (2019). This Court has seen several cases over recent years where reunification efforts were excused, although none considered due process concerns. *See, e.g.*, *Jacbos v. Div. of Family Servs.*, 206 A.3d 260, 2019 WL 925860 (Del. Feb. 25, 2019) (TABLE); *Jackson v. Div. of Family Servs.*, 184 A.3d 340, 2018 WL 1545936 (Del. Mar. 29, 2018) (TABLE); *Harris v. Dep't of Servs. for Children, Youth and their Families/Div. of Family Servs.*, 124 A.3d 582, 2015 WL 5316842 (Del. Sept. 10, 2015) (TABLE); *Stewart v. Div. of Family Servs.*, 21 A.3d 597, 2011 WL 2020823 (Del. May 24, 2011) (TABLE).
[63] 11 *Del. C.* § 1103; 42 U.S.C. § 671(a)(15)(D).
[64] *Monceaux v. State*, 51 A.3d 474, 477 (Del. 2012).
[65] *See Troxel v. Granville*, 530 U.S. 57, 80 (2000) (Thomas, J., dissenting) ("The opinions of the plurality, . . . recognize such a [fundamental] right [to parent], but curiously none of them articulates the appropriate standard of review."); Margaret Ryznar, *A Curious Parental Right*, 71 SMU L. Rev. 127, 133 (2018) ("The parental right has a long history in the case law of the U.S.

considering parental rights in the termination context, however, the *Mathews* standard applies to due process concerns.[66] As noted earlier, we must weigh how the "no reasonable efforts statute" affects the risk of erroneous deprivation and probable value of additional procedures—in this case requiring reasonable efforts to reunification, which includes providing the parents a case plan to complete.

For a facial challenge to succeed, the statute cannot be valid under any set of circumstances.[67] In other words, every application of the no reasonable efforts statute must cause an impermissible risk of erroneous deprivation, or stated in reverse, requiring reasonable efforts must create at least some likelihood of preventing an erroneous termination.[68] Here, the no reasonable efforts statute expresses the General Assembly's intent that for the categories of cases where

---

Supreme Court, with the Court declining to select a level of scrutiny despite many opportunities to do so.").

[66] *See Santosky v. Kramer*, 455 U.S. 745, 754 (1982) ("[T]he nature of the process due in parental rights termination proceedings turns on a balancing of the 'three distinct factors' specified in *Mathews v. Eldridge, . . . .*"). Father points to a Florida Supreme Court decision that applied strict scrutiny—the least restrictive means test—to termination proceedings. *Padgett v. Dep't of Health and Rehab. Servs.*, 577 So.2d 565, 571 (Fla. 1991). While it is not clear to us why *Padgett* departs from the test in *Mathews*, we read *Mathews* and the cases that follow it to apply the three-part test when considering due process challenges to terminating parental rights decisions. This does not imply, necessarily, application to other parental rights challenges. *See* Ryznar, *supra* note 65, at 131 ("It is difficult to set one level of scrutiny for different issues that variously burden the essence of parenthood, ranging from student uniforms in public schools to removal of children from their home.").

[67] *Delaware Bd. of Med. Licensure and Discipline v. Grossinger*, 224 A.3d 939, 956 (Del. 2020).

[68] *See State v. Maria C.*, 94 P.3d 796, 808 (N.M. Ct. App. 2004) (finding the second factor in the parents' favor when there is a "reasonable likelihood the outcome might have been different" with the additional procedures) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544 (1985)).

planning is excused, the behaviors are so serious and the risk to the child is so high that requiring planning would only further endanger the child.[69] And DSCYF's burden to prove by clear and convincing evidence that there are grounds for termination and termination is in the child's best interests adds protection against erroneous deprivations.[70] We are not persuaded that, given the severity of the grounds for termination, and the option to case plan in any given case,[71] excusing the requirement to pursue reasonable efforts when the State has proven serious physical abuse of a child creates an impermissible risk of erroneous termination in every possible case.[72]

---

[69] *See Newmark v. Williams*, 588 A.2d 1108, 1116 (Del. 1991) ("Clearly, the State can intervene in the parent-child relationship where the health and safety of the child and the public at large are in jeopardy," and the State "has a special duty to protect its youngest and most helpless citizens."); *In re Hanks*, 553 A.2d 1171, 1177 (Del. 1989) (noting "the State's interest in protecting minors is strong," but not absolute); *Burns*, 519 A.2d at 644 ("The interests of the child remain paramount," and "where the best interests of the child and those of the parent conflict, the best interests of the child shall prevail.").

[70] *Sampson v. Div. of Family Servs.*, 868 A.2d 832, 836 (Del. 2005) (finding that a grounds for termination did not violate due process because DFS still had "to prove that termination of parental rights is in the child's best interest," thus protecting "against an erroneous deprivation of parental rights"); *In re Hanks*, 553 A.2d at 1178 ("The State protects the parent's interest by requiring a showing, by clear and convincing evidence, that the parent is unable to meet the statute's guidelines before parental rights will be terminated."). While there may be concerns about how the exception may affect the burden of proof in practice, Father does not argue there was any misapplication of the burden of proof, nor do we find any concern here. *See* Kendra Huard Fershee, *The Parent Trap: The Unconstitutional Practice of Severing Parental Rights Without Due Process of Law*, 30 Ga. St. U. L. Rev. 639, 685 (2014) (arguing that the practice of excusing reunification efforts, at least on certain grounds, may shift the burden of proof and require the parents to prove fitness).

[71] 13 *Del. C.* § 1103(d) ("The Department . . . is not prohibited from performing[] reunification and related services.").

[72] *See McDade v. State*, 693 A.2d 1062, 1065 (Del. 1997) ("All reasonable doubts as to the validity of a law must be resolved in favor of the constitutionality of the legislation."); *Wilmington Med.*

Turning to the as-applied challenge, where Father claims that the statute is not valid when applied to the particular circumstances of this case,[73] he argues that had DSCYF pursued reasonable efforts, it would have provided a case plan and, upon its completion, been compelled to return Giselle to her parents.[74] But the court allowed the parents to try and show they could be fit parents and found that they completed many activities typically included in a case plan.[75] Despite those actions, the court found the parents unfit to care for Giselle. Further, it is unlikely the parents could have completed a case plan without explaining adequately the sibling's injuries and providing a remedy, or that completing a case plan would have been sufficient to avoid termination. As a result, requiring reasonable efforts to reunify the family would likely not have led to a different result, and there was not an impermissible risk of erroneous termination of parental rights.[76]

---

*Ctr., Inc. v. Bradford*, 382 A.2d 1338, 1341 (Del. 1978) ("Every presumption is in favor of the validity of a legislative act and all doubts are resolved in its favor; and if the question of the reasonable necessity for regulation is fairly debatable, legislative judgment must be allowed to control.") (quoting *Justice v. Gatchell*, 325 A.2d 97, 102 (Del. 1974)).

[73] *Grossinger*, 224 A.3d at 956.

[74] Father's Opening Br. at 23 ("[Parents] were denied the remedy of filing for rescission of custody based upon completion of a reasonable case plan by not having a case plan to complete.") (emphasis omitted). Father does not argue the statute is unconstitutional under *Mathews*, but he argues it is not the least restrictive means of terminating parental rights. He adds that reasonable efforts would have included providing Spanish resources and limiting Ms. Randall's assessments to coaching the parents.

[75] *See* Opinion at *10 ("Mother and Father have taken many active steps toward completely [sic] what would have been a case plan had DSCYF/DFS been required to case plan with them.").

[76] Although this issue has been discussed sparingly by other courts, several other state appellate courts agree, at least with respect to their specific statute. *In re Heather C.*, 751 A.2d 448, 455–56 (Me. 2000) (finding a minimal risk of erroneous deprivation of parental rights when

## C.

Father also claims that the court improperly conditioned their parental rights on admitting culpability for the injuries to the older sibling. According to Father, the condition improperly pitted their fundamental right to parent against their Fifth Amendment right against self-incrimination.

The court found that the parents did not have Fifth Amendment rights in this case because it was not a criminal proceeding. This is incorrect. Under the Fifth Amendment, an individual has the right to refuse to answer "official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."[77] The State may not penalize an individual for exercising a constitutional right.[78] Although the court applied the law incorrectly, for the reasons below, we do not find a constitutional violation.

---

reunification is not required because it is discretionary, reviewable, and the state has significant interests in protecting the child and using resources efficiently); *In re Baby Boy H.*, 73 Cal. Rptr. 2d 793, 799 (Cal. Ct. App. 1998) (finding that when reunification is excused, it is because "the Legislature recognizes that it may be fruitless to provide reunification services" and "offering services would be an unwise use of governmental resources"); *see also In re L.N.*, 689 N.W.2d 893, 898 (S.D. 2004) (finding that "a court must necessarily consider whether a less restrictive alternative is appropriate in making the" decision to excuse reunification efforts because the statute "does not preclude reunification efforts," it simply makes them not required).

[77] *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973); *see Bradley v. State*, 559 A.2d 1234, 1243–44 (Del. 1989) (adopting the same).

[78] *Lewis v. State*, 626 A.2d 1350, 1358 (Del. 1993) ("[T]he State may not put a penalty on the exercise of a constitutional right.").

Father points to statements by DSCYF and the Family Court as evidence that reunification was conditioned on admitting criminal conduct involving the older sibling's injuries. For example, DSCYF would have case-planned with one parent if the other admitted responsibility for the injuries to the child's sibling.[79] And the court reasoned, in part, that because they did not "admit[] culpability," the unexplained injuries to the older sibling supported terminating parental rights.[80] This, Father argues, "crippled their fundamental rights to parenthood by conditioning preservation of one fundamental right on waiver of another."[81]

We first note that Father did not testify, and Mother did not address the right not to self-incriminate in the Family Court proceedings.[82] Thus, the question is whether the court penalized the parents for not admitting to criminal liability. Often

---

[79] *See* Father's Opening Br. Ex. B at 2 ("If, according to [DSCYF/DFS], it was known which parent was responsible for the sibling's injuries and the parents no longer resided together, DSCYF/DFS would be willing to plan for reunification with the non-culpable parent, assuming one parent was innocent in the infliction of the injury to Child's sibling."); App. to Mother's Opening Br. at A0269 (When the court asked what difference the parents could show to indicate their ability to safely care for the child, DFS's witness testified "[n]othing or at – at least some type of responsibility or answer to how [the child's sibling] had suffered those injuries.").

[80] Opinion at *18 ("[T]here is little evidence that Mother and Father have specifically addressed these past injuries to Child's siblings in their efforts to reunify with Child upon which the Court could conclude that this past issue has been remedied. They have not admitted culpability, they remain together and they [sic] was no express testimony that any of their participation in counseling, domestic violence classes or parenting classes has addressed how to ensure that such injuries do not happen again to children in their care.").

[81] Father's Opening Br. at 44.

[82] *See* App. to Mother's Opening Br. at A0772 (When questioned whether it was Mother's testimony that she had "no explanation for how any of those three injuries occurred" to the sibling, Mother responded "[n]o – yes, but if you also would conduct a – like, more investigation, would have asked more questions, you would have seen that all eyes were now going to go – lay on us.").

times, a state agency removes a child because of the parents' alleged improper or abusive conduct. When the parents are in the best and only position to know reliably what happened, the tension between the Fifth Amendment and parental rights is inevitable. When this happens, it is important to distinguish between an affirmative order requiring admission, which violates the right not to self-incriminate, and an order setting reasonable conditions for returning the child that are not related directly to culpability.[83]

Here, the court had to find the home safe before returning the child. The severity of the sibling's injuries and the lack of reasonable explanation contributed to the court finding the home unsafe—without knowing the cause, the court could not determine a remedy. To refute that finding, the parents had to show that the home was safe. If that conflicts with the parents' admission of culpability, the court

---

[83] Consistently, courts have upheld reasonable conditions before returning a child. *See, e.g., Matter of A.D.L.*, 402 P.3d 1280, 1286 (Nev. 2017) ("[T]here is a distinction between a court-ordered case plan that mandates admission of culpability for family reunification and one that requires meaningful therapy for family reunification[,] . . . and a failure to participate in meaningful therapy may result in the termination of parental rights without a violation of the Fifth Amendment, so long as the court did not mandate an admission of guilt."); *In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002) ("The State may not penalize [the parent] for noncompliance with a court order impinging on his right against self-incrimination. But this is as far as the Fifth Amendment privilege extends. The State may require parents to otherwise undergo treatment, but it may not specifically require an admission of guilt as part of the treatment. Contrary to [the parent's] assertions, a person's exercise of a constitutional right *may* indeed have consequences. One such consequence may be a person's failure to obtain treatment for his or her problems.") (citations omitted); *In re M.C.P.*, 571 A.2d 627, 641 (Vt. 1989) ("The trial court cannot specifically require the parents to admit criminal misconduct in order to reunite the family. On the other hand, the parents must demonstrate to the court that it is in the juvenile's best interest to return custody to the parents in the face of the serious misconduct the court found they engaged in.").

could reasonably prioritize the safety of the child. The parents had the right not to incriminate themselves, but they did not have the right to avoid the consequences of no explanation for the injuries. Further alleviating the Fifth Amendment concern, the court found the lack of explanation was "not dispositive alone," and it provided additional reasons for why it concluded that "the conditions resulting in the prior findings likely continue to exist."[84] Thus, the parents were not penalized even if they had invoked their Fifth Amendment rights during the hearing.

## IV.

We affirm the Family Court's judgment terminating parental rights in Giselle.

---

[84] Opinion at *8. At a minimum, the parents still lived together, had not sought services on how to protect young children, and had deficient parenting skills.