IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KAREN WATSON[1], | § | |
| | § | |
| Respondent Below, | § | No. 191, 2023 |
| Appellant, | § | |
| | § | Court Below: Family Court |
| v. | § | of the State of Delaware |
| | § | |
| DIVISION OF FAMILY | § | File No. 21-08-04TS |
| SERVICES and OFFICE OF | § | Petition No. 21-19335 |
| CHILD ADVOCATE, | § | |
| | § | |
| Petitioners Below, | § | |
| Appellees. | § | |

Submitted: December 13, 2023
Decided: March 11, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, and **LEGROW**, Justices.

## **ORDER**

After considering the parties' briefs and the record on appeal, it appears to the Court that:

(1) The appellant ("Mother") is the parent of three minor children. Mother filed this appeal from a Family Court order that terminated her parental rights as to all three of her children. The court primarily based its decision on Mother's failure to make progress on a case plan established by the Division of Family Services (the "Division"). On appeal, Mother contends that the court's finding that she failed to

---

[1] The Court previously assigned a pseudonym to the appellant under Supreme Court Rule 7(d).

plan for her children's safe return under 13 *Del. C.* § 1103(a)(5) was clearly wrong for three reasons. *First*, she argues that her status as a domestic violence victim is not sufficient evidence of her "failure to plan" for her children's safe return. *Second*, she contends that the court placed undue weight on the existence of telephone calls between herself and her children's father. *Third*, she asserts that her status as a domestic violence victim bears no correlation to her parental fitness. None of Mother's arguments support reversal and we therefore affirm the Family Court's order.

### FACTUAL AND PROCEDURAL BACKGROUND

(2) Steven Schorb ("Father") is the father of Mother's three minor children. Both Mother and Father have histories of substance abuse, unstable housing, and erratic employment. Father has an extensive history of committing domestic violence against Mother in the children's presence.

(3) Florida child welfare authorities had custody of Mother and Father's children from November 2014 until June 2018. When the family arrived in Delaware in 2019, an existing Florida protective order prohibited Father from contacting Mother and the children. Beginning in May 2019, Father was arrested multiple times for violating no-contact orders issued in Florida and Delaware.

(4) The Division first took custody of Mother's children in September 2019. Because of Father's domestic-violence-related charges involving Mother as

2

the victim, Mother and Father's case plans focused on domestic violence. Throughout all the proceedings, Father failed to complete any of his case plans, and the Family Court eventually terminated his parental rights.

(5) Mother's case plans required her to cease contact with Father. In violation of her case plan, Mother initially maintained contact with Father, actively sought to modify the protective orders, and expressed her wish to reunite with the children and Father "as a family." As time went on, however, Mother progressed through her case plan and "appeared to end her relationship with Father." At this point, all parties agreed that reunification should remain the permanency goal. In late 2020, after Division workers saw Father at Mother's residence, the court warned Mother that reunification would not occur if Father continued to be involved with the family.

(6) In March 2021, Mother presented evidence that she had re-engaged with her domestic violence counselor, maintained her housing and employment, and expanded visits with her three children to unsupervised overnight stays in her home. Mother and her children began a trial home placement in March 2021.

(7) On May 17, 2021, the Family Court returned sole custody of the three children to Mother. But only two days later, during a routine traffic stop, police encountered Mother and Father together in Mother's vehicle. Although Mother later reported that she was driving Father to the police station, that explanation was not

consistent with the record. Later that night, after the traffic stop, Father forcibly entered Mother's residence armed with several weapons. There, Father assaulted Mother, causing bruising and swelling in her cheeks, jaws, eyes, and lips. Before absconding, Father stole Mother's car keys and cell phones. When police arrived, Mother denied anyone else was present in her home. The responding officers then conducted a protective sweep and found all three children in the bedroom.

(8) Following this incident, the Division reassumed custody of the children. The next morning, Mother's eldest child told Division workers that Father recently had resumed staying overnight at Mother's residence. On June 16, 2021, law enforcement apprehended Father at Mother's residence where he was hidden in a bedroom closet and armed with a knife.

(9) On July 22, 2021, the Division filed a motion to be relieved of reunification services. On August 17, 2021, Mother filed a motion seeking to regain full custody of the three children. On August 19, 2021, the Division filed a petition to terminate Mother's parental rights based on her "failure to plan adequately for the children's physical needs or mental and emotional health and development." The first permanency hearing was held over two days on November 29, 2021, and February 7, 2022.

(10) Dr. Angela Hattery ("Dr. Hattery") testified that the children could safely be returned to Mother's care because it was Father, not Mother, whose

4

violence posed a risk to the children. In Dr. Hattery's view, Mother consistently protected the children from violence, and they were never physically harmed while in her care. Concerning Father's break-in and assault, Dr. Hattery testified that Mother acted in a "protective capacity" because she called 9-1-1. Dr. Hattery did not interview the children because, in her opinion, doing so was "not germane to her expertise." Dr. Hattery testified that regardless of whether the children had been exposed to domestic violence, it remained her opinion that Mother could safely resume custody and care of the children.

(11) Dr. Katherine Elder ("Dr. Elder") testified as an expert regarding the effects of the children's continued exposure to domestic violence. Dr. Elder interviewed Mother, who insisted that the children were not present for—and never witnessed—any domestic violence incidents. Dr. Elder, however, interviewed all three children and testified that each child had been exposed to significant domestic violence. One child detailed a time that he witnessed Father choking Mother. When the child tried to call 9-1-1, Mother alerted Father, who caught the child and threw him down on the bed. The middle child stated that she had witnessed Father hurting Mother during arguments. Dr. Elder opined that Mother "minimized the impact" of domestic violence on her children and failed to acknowledge her role in the children's exposure to violence. And, in addition to continuing her own relationship with Father, Mother acquiesced in her eldest child and Father having extensive

5

phone contact while the no-contact orders were in place. Dr. Elder acknowledged that it is Father who is violent but pointed out that Mother repeatedly exposed the children to Father despite his violence.

(12) Dr. Elder further testified that children who are exposed to domestic violence are statistically more likely to become perpetrators themselves. She believed that Mother's three children had been "gravely impacted" by their upbringing. Two of Mother's children were diagnosed with PTSD and experienced significant anxiety. Upon entering foster care, Mother's eldest child started fights at school and expressed his desire to hurt Father. After some time in foster care, however, the eldest child made honor roll, engaged in enrichment activities, and established a strong bond with his two sisters. Regular counseling sessions appeared to help the children, and Dr. Elder emphasized that continuing to live in a safe, structured, and stable environment would help them cope with their negative childhood experiences. In October 2022, the children's foster parents submitted a letter of intent expressing their desire to adopt all three children.

(13) After the first permanency hearing, the court was not convinced that terminating Mother's parental rights was in the children's best interests. The court ordered the Division to engage in reunification planning with Mother and to make domestic violence the central element of her case plan. On May 16, 2022, the court imposed an updated case plan that required Mother to: (i) work with a family

6

interventionist; (ii) maintain employment and provide proof of income; (iii) obtain and maintain stable housing appropriate for her and the children; (iv) attend the children's health and educational appointments; (v) participate in mental health counseling as a victim of domestic violence; and (vi) have no contact with Father and ensure that there was no contact between Father and the children. Mother was required to immediately report any efforts by Father to contact her or the children.

(14) In July 2022, the children's guardian *ad litem* provided to the court recordings of phone calls between Mother and Father while Father was incarcerated. The 244 recordings spanned from August 2021, after Father's arrest and the imposition of a no-contact order, through April 2022, just two months before Father's release from incarceration. During that time period, while the Family Court conducted the first permanency hearing and directed the Division to re-engage in providing reunification services with Mother, Mother and Father secretly communicated without informing the Family Court. After listening to the recorded calls, the court stated that it would have ruled differently after the first permanency hearing had it known the nature and extent of Mother and Father's ongoing communications.

(15) Specifically, those recordings revealed Mother and Father's determination to maintain contact despite court orders and Mother's case-plan requirements. To circumvent the no-contact orders from prison, Father would call

7

his own father, who then would call Mother. Both Mother and Father used aliases and warned each other not to reveal any identifying information on the calls. Mother and Father consistently expressed their love for each other, lamented being apart, and talked about reunification. Mother put money in Father's prison account so that he could continue calling her. She later testified that after a 21-year relationship with Father, she "felt the need to help" him.

(16) Regarding the May 20, 2021 break-in and assault, Father repeatedly demanded that Mother contact the prosecutor to retract her statement and request that the no-contact order be rescinded. Mother admitted that she did retract some of her statements. On the recordings, however, Mother advised Father to accept a plea because she would "have all the other stuff said and done" by the time he was released from incarceration. Throughout the calls, Father threatened to harm Mother, cursed at her, accused her of infidelity, and blamed her for his incarceration. Mother told Father that she was dating another man only to prove to the court that she had moved on, but promised to leave him as soon as Father got out of prison. In addition, dozens of phone calls revealed Mother's continued illicit drug use. Just twelve days before the first permanency hearing, Mother and Father coordinated stories to blame their eldest child for Mother and Father's contact during the trial home placement.

(17)   Mother did not disclose her ongoing contact with Father until the prison phone calls were revealed in court.  During the second permanency hearing, Mother testified that she last had contact with Father about one month earlier.  But on cross-examination, Mother admitted to speaking with Father that morning.

(18)   Mother's family interventionist testified that throughout these proceedings, Mother's housing was "inconsistent" and her employment status frequently changed.  At no point did Mother accept her family interventionists' offers to assist her with budgeting and housing services.  A supervisor at Mother's transitional housing facility testified that Mother was removed from that housing after a security camera captured her bringing Father into her townhome on three separate occasions in August 2022.

(19)   Because Mother failed to sever ties with Father and was unable to maintain appropriate housing for her and the children, the Family Court found that Mother failed to satisfy her case plan and a statutory basis for termination of her parental rights therefore existed under 13 *Del. C.* § 1103(a)(5).  On May 11, 2023, the Family Court terminated Mother's parental rights.

## ANALYSIS

(20)   "When reviewing the decision of the Family Court to terminate parental rights, this Court conducts a 'review of the facts and law, as well as the inferences

9

and deductions made by the trial court.'"[2]  Legal conclusions are reviewed *de novo*.[3]

Factual findings are reviewed to ensure that they are supported by the record and are

not "clearly wrong."[4]  "If the Family Court has correctly applied the law, our review

is limited to abuse of discretion."[5]

(21)  Mother argues that the court's finding that she failed to plan for her

children's safe return was clearly wrong because: (i) her status as a domestic violence

victim is not sufficient evidence of her "failure to plan" under 13 *Del. C.* §

1103(a)(5); (ii) the court placed undue weight on the prison call recordings; and (iii)

her status as a domestic violence victim bears no correlation to her parental fitness.

**A. The trial court did not abuse its discretion by finding that Mother failed to plan for her children's safe return under 13 *Del. C.* § 1103(a)(5).**

(22)  Under Delaware law, a trial judge must conduct a two-step analysis

when deciding whether or not to terminate parental rights.[6]  First, the judge must

determine whether there is clear and convincing evidence that one of the grounds for

termination enumerated in 13 *Del. C.* § 1103(a) has been met.[7]  If one of the

---

[2] *Brock v. Dep't of Servs. for Child., Youth, & Their Families*, 272 A.3d 781, 787 (Del. 2022) (quoting *Powell v. Dep't. of Servs. for Children, Youth & Their Families*, 963 A.2d 724, 730 (Del. 2008)).

[3] *George v. Dep't of Servs. for Child., Youth & Their Families*, 150 A.3d 768, 2016 WL 6302525, at *4 (Del. Oct. 27, 2016) (TABLE).

[4] *Bower v. Dep't of Servs. for Child., Youth & Their Families*, 142 A.3d 505, 2016 WL 3382353, at *4 (Del. June 9, 2016) (TABLE).

[5] *Bower,* 2016 WL 3382353, at *4.

[6] *Powell*, 963 A.2d at 731.

[7] *Id*.

enumerated grounds for termination has been met, the trial judge next determines if there is clear and convincing evidence that termination of parental rights is in the child's best interest as defined under 13 *Del. C.* § 722.[8] "[W]here termination of parental rights is sought primarily on the ground that a parent has failed, or was unable, to plan adequately for a child's needs . . . the trial court is required to make appropriate findings of fact and conclusions of law" regarding the State's compliance with the Child Welfare Act of 1980[9] and 29 *Del. C.* §§ 9003.[10] If a parent fails to fulfill even one case plan requirement, 13 *Del. C.* § 1103(a)(5) is satisfied and a statutory basis for termination may be found even where a parent otherwise has completed the plan.[11]

(23) Mother argues that Father's violence toward her is not evidence of her own failure to plan under 13 *Del. C.* § 1103(a)(5). The Family Court, however, found a statutory basis for termination under 13 *Del. C.* § 1103(a)(5) based on Mother's failure to satisfy elements of her case plan, not on her status as a domestic violence victim.[12] The Family Court held that despite numerous opportunities over the course of four years, Mother had not fulfilled the requirements of her case plan

---

[8] *Id*. In this case, the Family Court ruled that terminating Mother's parental rights was in the children's best interests. Termination of Parental Rights Order ("TPR Order") at 44. Mother does not contest that finding on appeal.

[9] 42 U.S.C. §§ 608, 620-28, 670–76 (1982).

[10] *Matter of Burns*, 519 A.2d 638, 649 (Del. 1986).

[11] *Griffin v. Dep't of Servs. for Child., Youth & Their Families*, 296 A.3d 882, 2023 WL 3046056 at *2 (Del. Apr. 21, 2023) (TABLE).

[12] TPR Order at 23–24.

because she refused to sever her relationship with Father and could not maintain stable housing.[13] That holding was not novel; this Court has previously considered a parent's inability to sever an abusive domestic relationship as evidence of a parent's failure to plan.[14]

(24) The Family Court's decision detailed Mother's history of repeatedly failing to complete the elements of her case plan. Contrary to her case plan, Mother maintained contact with Father, despite repeated warnings that doing so would prevent reunification with her children. She renewed contact with him in violation of court orders and despite his incarceration. This was not an instance in which Father violated the no-contact order despite Mother's efforts to keep herself and the children away from him.

(25) Mother is not at fault for Father's violent and criminal conduct toward her. But the Family Court correctly held that Mother's repeated failure to sever ties with Father in contravention of her case plan constituted evidence that she failed to plan for her children's "physical needs or mental and emotional development."[15] The Family Court received testimony that repeated exposure to domestic violence presented a dangerous risk to the children's overall health and well-being. The court did not find a statutory basis for termination of Mother's parental rights under 13

---

[13] *Id.* at 24.
[14] *See Murray v. Div. of Fam. Servs.*, 85 A.3d 88, 2014 WL 643760 (Del. Feb. 7, 2014) (TABLE).
[15] 13 *Del. C.* § 1103(a)(5).

*Del. C.* § 1103(a)(5) because she was assaulted. Rather, it relied on evidence of Mother's repeated failure to complete elements of her case plan.

**B. The trial court properly weighed the evidence, including the recordings of phone calls between Mother and Father.**

(26) Mother argues that the trial court "grossly over-exaggerated" how the prison phone calls reflected on her parental fitness. Mother points to the Family Court's statement that it "would likely have reached a different decision at the last permanency hearing" had it been aware of Mother and Father's continued contact as evidence that the recordings were the "but for" cause of the "absurd result" reached by the trial court. This argument diminishes these phone calls' substance, ignores Mother's repeated violation of the court's no-contact orders, and fails to recognize the other evidence on which the court relied in deciding to terminate Mother's parental rights.

(27) First, the phone calls demonstrated Mother's continued willingness to defy and circumvent the no-contact orders and reflected negatively on her credibility. Mother and Father utilized third parties to facilitate their communications, used aliases while speaking to each other, and devised other ways to mislead the court. The recordings further revealed Mother's repeated dishonesty with the court, the Division, and her domestic violence counselors. Second, the recordings showed that Mother had no intention of complying with her case plan requirement to sever ties with Father. She expressed to Father that she would always love him, could not wait

13

to be with him, and was dating another man temporarily to convince the court that she had moved on. Third, the recordings revealed Mother's repeated use of illicit drugs. For all those reasons, the recordings were important evidence on which the court properly relied.

(28) Further, in addition to the recordings, the second permanency hearing revealed new information previously unknown by the court. In direct violation of her case plan and against her shelter's rules, Mother brought Father into her home overnight on August 7, 8, and 29, 2022. Mother therefore was removed from her housing on September 1. Mother's family interventionist testified that Mother's housing and employment had been "inconsistent." Not only did Mother fail to protect her children from exposure to Father's domestic violence, she also failed to "maintain stable housing … appropriate for herself and the children" as the case plan required.

### C. The trial court did not terminate Mother's parental rights because she is a domestic violence victim.

(29) Finally, Mother argues that her status as an assault victim bears no correlation to her parental fitness. That argument reprises her first argument on appeal.[16] The trial court terminated Mother's parental rights in part because there

---

[16] The overarching theme of Mother's appeal is that the Family Court punished her rather than recognizing her status as a domestic violence victim. To that end, Mother relies on *Nicholson v. Williams*, a case in which a federal district court held that New York's institutional practice of removing abused mothers' children from their custody without proper investigation violated a class of mothers' procedural and substantive due process rights. *See Nicholson v. Williams*, 203 F.

14

was no reason to believe that Mother would ever sever her relationship with Father. By repeatedly allowing the children's exposure to Father's domestic violence, as Dr. Elder testified, Mother contributed to the children's trauma.

(30)  Mother contends that there is no nexus between her own relationship choices and her children's safety; rather, she has been "cloaked with [Father's] propensity for family violence."  But Mother's own actions toward Father directly affected the children: (1) by allowing Father into her home in August 2022, Mother lost the housing she had obtained for herself and the children; and (2) Mother allowed phone contact between Father and their eldest child in direct violation of court orders.  The Family Court correctly concluded that Mother's inability to recognize that her relationship with Father posed a significant risk to her children directly reflected on her own parental fitness.

For the foregoing reasons, we conclude that there is no merit to Mother's appeal.  NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED.

BY THE COURT:

*/s/ Abigail M. LeGrow*
Justice

---

Supp. 2d 153 (E.D.N.Y. 2002). Mother's case is not akin to *Nicholson*, nor does the *Nicholson* case stand for the proposition that an abused mother's parental rights should not or cannot ever be terminated.